MITCHELL ADELSON *vs.* SHELDON ADELSON & another.[1]

No. 01-P-1790.

Middlesex. June 18, 2003. - April 5, 2004.

Present: PERRETTA, RAPOZA, & TRAINOR, JJ.

*Corporation,* Stockholder, Stock, Valuation of stock, Director's liability. *Evidence,* Relevancy and materiality. *Fiduciary. Practice, Civil,* Instructions to jury.

A Superior Court judge properly denied a plaintiff's motion for judgment notwithstanding the verdict on his claims of fraud and breach of fiduciary duty against the defendants, officers of a closely held corporation in which the plaintiff was a minority shareholder, where the evidence failed to show that the defendants had intentionally misrepresented or failed to disclose any material fact to him regarding the value of his stock, which showed no current economic benefit, when he sold it to one of the defendants, who was also the corporation's majority shareholder. [762-766]

Any error in a judge's instructions to the jury regarding the burden of proof on a fiduciary in a shareholder's action against the majority shareholder and director of that corporation was harmless, where there was no evidence to show that that defendant owed the plaintiff either a fiduciary or special duty under the circumstances. [766-769]

CIVIL ACTION commenced in the Superior Court Department on September 25, 1997.

The case was tried before *Hiller B. Zobel,* J., and a motion for a new trial was heard by him.

*Martha Born* for the plaintiff.

*Franklin H. Levy* for Sheldon Adelson.

*Bruce A. Singal* for Charles Forman.

PERRETTA, J. This appeal arises out of an action brought against Sheldon Adelson and Charles Forman by Sheldon Adelson's

---

[1]Charles Forman, vice-president and in-house counsel to Interface Group-Nevada, Inc., and Interface Group-Massachusetts, Inc., as well as cotrustee of the Mitchell Adelson Trust.

sons, Mitchell and Gary,[2] in which they alleged fraud and breach of fiduciary duties for which they sought monetary damages as well as equitable remedies, viz., imposition of a constructive trust and rescission. The judge reserved his right to decide the question of whether Mitchell and Gary were entitled to equitable relief and put special questions to the jury on the remaining claims. Both the jury and the judge found against Mitchell and Gary.[3] On appeal, Mitchell argues that the judge erred in denying his motion for judgment notwithstanding the verdict on his claims of fraud and breach of fiduciary duty and in his findings and rulings on the claims for equitable relief as well as in the denial of his motion for a new trial on all claims. We affirm the judgment.

1. *The facts.* To understand fully the essence of Mitchell's grievance, that Sheldon had defrauded him, it is necessary to relate the facts in some detail. There was evidence to show that in 1989, Interface Group, Inc., was reorganized into two separate corporations, Interface Group — Nevada, Inc., and Interface Group — Massachusetts, Inc. Each of the new corporations had one hundred thousand shares, and each share of Interface Group, Inc., became one share of the Nevada corporation and one share of the Massachusetts corporation.

After the reorganization, the two corporations, collectively referred to as "Interface," continued to share administrative functions and issued combined financial statements. Sheldon is the founder and a director of Interface as well as the majority (50.001 per cent) shareholder. There were three other shareholders: Theodore Cutler, Irwin Chafetz, and Jordan Shapiro. For reasons soon to be apparent, we refer to these four shareholders

[2]Although Gary Adelson was also a named plaintiff who participated in the litigation, he chose to dismiss his appeal subsequent to its entry in this court. See Mass.R.A.P. 29(b), 365 Mass. 877 (1974). Mitchell and Gary's sister, Shelley Adelson (Shelley), did not join in the lawsuit. Sheldon adopted Mitchell, Gary, and Shelley when he married their mother.

[3]Although the judge was not bound by the jury's findings, he specifically stated in his findings of fact that he "agreed in all material respects with the jury's conclusions." Compare *Velleca* v. *Uniroyal Tire Co., Inc.*, 36 Mass. App. Ct. 247, 251 (1994) (findings made on claim brought pursuant to G. L. c. 93A, although inconsistent with jury's findings on common law counts, were not clearly erroneous and were, therefore, controlling on the c. 93A claim).

as the "older generation shareholders." Defendant Forman served as vice-president of and general counsel to Interface.

At all times relevant to this action, Interface was primarily engaged in the business of organizing, producing and managing trade shows for the computer and communications industries, and, to a lesser degree, the travel industry. Its main asset was the Comdex trade show.

Indeed, in April of 1988, the older generation shareholders formed Las Vegas Sands, Inc. (LVSI), a Nevada corporation, for purposes of acquiring the Sands Hotel and Casino in Nevada, with the intention of developing a convention center facility in order to house the growing Comdex trade show. At this time, Interface entered into loan agreements with third-party lenders. The terms of the third-party loan agreements limited the ability of Interface to pay distributions to shareholders other than any amounts that might be due on account of their tax liability. Interface used the loan proceeds to make loans directly to LVSI or to the older generation shareholders for investment in LVSI. In exchange, the older generation shareholders signed unsecured demand notes to Interface.

On June 1, 1989, Interface transferred fifteen thousand shares of treasury stock to the eleven children (the younger generation shareholders) of the older generation shareholders for a price of $265 per share. These fifteen thousand shares were distributed to each family in the same percentage amount as their father's interest in Interface and were divided, pro rata, within each family. In exchange for the shares, each younger generation shareholder issued a ten-year, interest-bearing demand note payable to Interface. All parties to these transactions understood that the purchase notes would be repaid only at such time as the shares were sold.

It was at this time that Mitchell acquired 2,941 shares of Interface stock, representing 2.941 per cent of the total number of shares in Interface, and issued a demand note to Interface with a principal balance of $779,399.[4] Although Sheldon wanted to divide his allocation of the treasury stock among his three children and his three siblings, he deferred to the wishes of the

---

[4] All three of Sheldon's children participated in this transaction upon the same terms. See note 2, supra.

other older generation shareholders and instead conditioned the sale of his stock to his children upon their promise that they would share equally with his siblings any income attributable to the stock, including dividends or proceeds from its sale.

On December 12, 1989, Mitchell signed a memorandum of understanding (MOU) to that effect. That is, in consideration for the opportunity to acquire stock in Interface exclusive of Sheldon's siblings, Mitchell agreed to assume an obligation to give them fifty per cent of any distributions, net of various and specified deductions. Although disputed, there was evidence to show that Mitchell agreed to this condition.[5]

Before signing the MOU, Mitchell and all the younger generation shareholders entered into a voting trust in which they designated Forman as the voting trustee and transferred their shares to the trust in exchange for certificates of beneficial interest. Mitchell then transferred his certificates of beneficial interest to a second trust, the Mitchell Adelson Trust, under which he and his issue were named as beneficiaries. Mitchell and Forman were cotrustees of this trust, and Forman, as the disinterested trustee, had sole discretion to make distributions from the trust. The indenture establishing the Mitchell Adelson Trust provided: "[w]ith respect to stock held in any separate trust created hereunder . . . all rights . . . available to stockholders under Massachusetts . . . law, including . . . [the] right to inspect corporate records . . . shall be . . . exercisable solely by [the] disinterested trustee . . . ."[6] All the younger generation shareholders established individual trusts upon substantially the same terms.

From June 1, 1989, through November 29, 1994, Interface made no distributions to its stockholders aside from amounts equal to the income taxes due and payable. Consequently, Mitchell received no income from his stock during that time

[5]Mitchell denied any memory of an agreement to share stock proceeds with Sheldon's siblings and contends that the MOU is not a legal and enforceable agreement.

[6]At trial the parties disputed the legal effect of this indenture language with respect to the Interface shares held in the voting trust as the voting trust was not "created hereunder."

other than what was necessary to pay his tax obligation.

Throughout these years, one of the older generation shareholders, Chafetz, was concerned that Interface's financial dependence upon a single, dominant asset, Comdex, invited the risk associated with an undiversified product line. He persistently advocated for the sale of Comdex while the market was favorable. In late 1993, early 1994, Chafetz proposed to Sheldon that he would be willing to sell the fifteen percent interest he and his children owned in Interface as well as related interests in other ventures for a total price of $30 million. Sheldon declined the offer.

In the fall of 1994, contemplating the investment risks inherent in stock ownership and holding serious concerns about Mitchell's ability to earn a living, Sheldon offered to buy Mitchell's shares of Interface stock.[7] Sheldon and Mitchell had two discussions in 1994 concerning this matter, the first on October 20, and the second sometime in early November. Although the record before us does not disclose the specifics of these conversations, it does reveal the gist of them.

Sheldon identified to Mitchell certain business risks facing Interface, indicated that he wanted to give him an opportunity to sell his stock, and indicated that he was willing to purchase Mitchell's stock for an amount between $3 million and $5 million. Sheldon also related during these conversations that he had received and rejected numerous offers concerning the sale of Interface but that he did not foresee selling Interface any time in the near future. While acknowledging to Mitchell that Mitchell would have to decide whether to hold or to sell his stock, Sheldon opined that his offer to buy might be Mitchell's best opportunity to assure a minimum return on his stock. Shel-

---

[7]Although Mitchell argues that there was evidence to show that Sheldon anticipated that Interface would soon begin making distributions to shareholders and was motivated by a desire to limit the amount of money Mitchell would realize from his Interface stock, we note the abundance of evidence concerning Sheldon's generosity over the years to Mitchell, Gary, and Shelley and the justification, which we choose not to detail, for his concerns about Mitchell's ability to earn a living.

don also advised Mitchell that he should feel free to consult with an attorney of his choice on the matter.[8]

About the same time that Sheldon began discussions with Mitchell concerning the purchase of his stock, Interface's ongoing efforts to procure a refinancing agreement with a third-party lender were about to come to fruition. On October 26, 1994, Interface entered into an agreement with a third-party lender that allowed Interface to declare non-cash distributions to its stockholders that would enable Interface to retire loans to its stockholders in the approximate amount of $146 million.

At the time Sheldon purchased Mitchell's stock, both Sheldon and Forman knew the contents of a private placement memorandum issued by Interface in July, 1994. That memorandum advised that Interface intended to remove from its books various loans made to shareholders by declaring non-cash distributions and then distributing to each shareholder the promissory notes memorializing their respective loan obligations. Because the older generation shareholders' debts to Interface exceeded their proportional shares, it was planned that their notes would be rewritten to be made payable by the fathers to their children's trusts and distributed to the younger generation shareholders. However, these notes were never rewritten and no payments were made on these obligations, either as planned or as actually memorialized, prior to the sale of Comdex.

Although the record does not reveal the actual date of Mitchell's acceptance of Sheldon's offer to purchase his stock, it does show that on November 9, 1994, Forman called Mitchell and scheduled a meeting for the following day at Forman's office for the purpose of completing Sheldon's purchase of Mitchell's stock. According to Mitchell, Forman told him that they had to complete the transaction the next day because of impending changes in the tax law. Forman testified that he had no memory of having made that particular statement to Mitchell. In any event, Mitchell, Gary, and Shelley met the next day with For-

---

[8]Mitchell denied that Sheldon ever advised him of his right to consult with an attorney.

man and Stephen O'Connor, Interface's chief financial officer. Sheldon was not at the meeting.[9]

At this meeting on November 10, 1994, Forman handed documents to Mitchell, giving a brief description of each and indicating where Mitchell should sign. Mitchell signed the documents without reading them. Mitchell testified that he asked Forman whether he should have independent counsel and that Forman told him that Sheldon would be insulted and not go through with the purchase were he (Mitchell) to do something of that nature. Mitchell did not deny the fact that he signed the documents without reading them. He stated that he did so because he believed that the transaction was being done for his benefit, that he trusted Sheldon and Forman, and that was the "way things were done."

Sheldon paid $5,298,879 for Mitchell's stock. The major portion of the purchase price was in the form of a ten-year, interest-bearing promissory note having a principal balance of about $3,070,000. The balance of the purchase price represented funds to pay the tax consequences of the transaction as well as a final reckoning of Mitchell's various obligations running directly either to Interface or to related parties but which had been held in abeyance while he was a shareholder. Put another way, Sheldon assumed certain obligations of Mitchell's which amounted to $1,164,419, including accrued interest. With respect to Mitchell's obligation under the MOU, $660,000 of the monies paid to Mitchell from the sale of his stock was used to make payments of $220,000 to each of Sheldon's three siblings. In return, Sheldon released Mitchell from any further obligation under the MOU. The balance of the purchase price was used to satisfy Mitchell's other debts and tax obligations arising out of the stock sale.[10]

Mitchell took Sheldon's promissory note and transferred it to the previously established Mitchell Adelson Trust. The note produced annual income interest in the approximate amount of

---

[9] In the preparation of the necessary paperwork, Sheldon was represented by independent counsel rather than Forman.

[10] Once again, Sheldon treated his three children equally, and the terms and circumstances of his purchase of Mitchell's stock were identical to those pertaining to his purchase of Gary and Shelley's stock.

$210,000.[11] Prior to Sheldon's purchase of Mitchell's stock, Mitchell had made no payment against the principal or interest on the ten-year, interest-bearing demand note that he had given Interface at the time of his acquisition of its stock.

There was evidence to show that the amount that Sheldon determined he was willing to offer for Mitchell's stock was not predicated solely on the underlying value of the shares but was also based upon his intention that Mitchell have a steady stream of current annual income as well as a future lump sum amount of money.[12] At Sheldon's direction, O'Connor evaluated his offering price in relation to the value of the shares and concluded that it was fair.

Rather than using a simple mathematical formula, O'Connor looked first to Interface's net value, which he estimated to be $430 million.[13] He then discounted the pro rata value of the shares, using a minority discount and a discount for the release of Mitchell's obligations to Sheldon's siblings under the MOU. Also, Chafetz testified that he would have sold his family's stock to Sheldon on November 10, 1994, for the same price offered to and received by Mitchell.

At the time of the sale, neither Sheldon nor Forman had informed Mitchell of how they had arrived at the purchase price nor did they tell him of Interface's plan to declare non-cash distributions. Mitchell, a college graduate with an advanced degree,[14] professed ignorance as to the most basic information concerning his stock, that is, he did not know the number of shares that he held nor did he have any idea of the value of his

---

[11]Interest on the note was payable at a floating rate with a minimum rate of seven percent.

[12]We note that in addition to the $210,000 annual income received by Mitchell on Sheldon's promissory note, there was also evidence that Mitchell was also receiving annual rental income of somewhere between $100,000 and $125,000, from a trust arrangement, sponsored by Sheldon, involving an office building located in Needham. If and when the building is eventually sold, Mitchell can reasonably expect to net $6 million. The same holds true as to Gary and Shelley.

[13]In determining Interface's value, O'Connor did not deduct $125 million to reflect the non-cash distributions planned in 1994.

[14]Sheldon paid the cost of Mitchell's education as well as that of Gary, and, we assume, based upon his history of treating his three children equally, any educational expenses incurred by Shelley.

shares. Notwithstanding his stated claim of ignorance, Mitchell acknowledged his opportunity to ascertain information about the value of his stock as well as the fact that he did not ask Sheldon or any other knowledgeable corporate insiders for information about the value of his shares or the financial condition of Interface, its earnings, indebtedness, or any offers to purchase it. In short, Mitchell acknowledged that he was under no pressure to sell his stock to Sheldon nor did he make any independent effort to ascertain the value of his shares prior to the sale.

On November 30, 1994, and again in January, 1995, Interface declared distributions to its shareholders in amounts totaling approximately $173 million. Approximately $151.9 million of that amount was distributed in the form of notes receivable from shareholders and demand notes retired by Interface. Had Mitchell owned his Interface stock at the time of these declared distributions, his trust would have received distributions worth about $5.2 million. These distributions, however, would have been in the form of a ten-year, interest-bearing promissory note from Sheldon, the forgiveness of Mitchell's own notes payable to Interface, and those funds necessary to pay his income taxes, all without regard for Mitchell's obligations under the MOU.

About five months after Mitchell sold his shares to Sheldon, Interface sold Comdex and thereafter redeemed the shares of the minority stockholders for $6,177 per share. Absent the sale of Comdex, Interface would not have redeemed the shares of the minority stockholders. However, neither Sheldon nor Forman foresaw Interface's sale of Comdex at the time of Mitchell's sale of his shares to Sheldon.

On September 25, 1997, Mitchell brought this action against Sheldon and Forman in which he sought damages against them as well as Forman's removal as trustee of the Mitchell Adelson Trust. His action was grounded upon allegations that Sheldon and Forman had misrepresented or failed to disclose material information pertaining to the sale of his shares in Interface to Sheldon for the purpose of inducing him (Mitchell) to sell his stock for less than its fair value.

In response to special questions, the jury answered that neither Sheldon nor Forman had misrepresented or failed to

disclose to Mitchell any material fact in respect to Sheldon's purchase of his stock. That being so, they did not reach the questions put to them regarding intent, causation or damages on Mitchell's claims of fraud. As established by their answers to the special questions put to them, the jury also found that neither Sheldon nor Forman was in breach of any fiduciary duty owed to Mitchell, notwithstanding their finding that Forman had acted as Sheldon's agent in connection with Sheldon's purchase of Mitchell's shares in Interface.

As for Mitchell's equitable claims seeking rescission of the sale of his Interface shares to Sheldon and the removal of Forman as trustee of the Mitchell Adelson Trust, the trial judge found that neither Sheldon nor Forman misrepresented, concealed, or omitted any fact material to Mitchell's decision to sell his Interface stock to Sheldon. Based upon these findings of fact, the trial judge concluded that there was no breach of any fiduciary duty owed to Mitchell by either Sheldon or Forman. That being so, and the judge having denied Mitchell's motion for judgment notwithstanding the verdict, judgment entered for the defendants on all counts of the complaint.

On appeal, Mitchell argues that he was entitled to judgment n.o.v. on his claims for fraud and breach of fiduciary duty as well as to judgment on his claims for equitable relief. These claims are based on his assertions that the facts withheld from him at the time of the sale of his shares in Interface to Sheldon were material as matter of law and conclusively established his right to judgment on all counts. He also contends that if he was not entitled to judgment n.o.v., he should be granted a new trial for the reason that the judge erroneously assigned the burden of proof to him when instructing the jury on his claim that Sheldon had violated his fiduciary obligations.

2. *The motion for judgment n.o.v.* We take up first Mitchell's argument that he should have been told that Interface intended to make non-cash distributions to its stockholders and that the purchase price of his stock assumed certain discounts.[15] He argues that this information was material as matter of law and

---

[15]Mitchell makes much of the fact that the purchase price of his shares contemplated a minority discount. Although a minority discount "is not always appropriate" where minority shares are sold to a majority shareholder,

that the defendants' failure to provide it entitled him to judgment on his claims of fraud against Sheldon and Forman.

The applicable law concerning the materiality of the information allegedly denied Mitchell defeats his argument. Where a shareholder takes action with respect to his stock, undisclosed information is material only if there is a "substantial likelihood" that a reasonable investor would view its disclosure as having "significantly altered the 'total mix' of information" available in deciding his choice of action in the transaction. *TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976). See *Milton* v. *Van Dorn Co.*, 961 F.2d 965, 969 (1st Cir. 1992) (applying the same standard to a securities fraud claim under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5, and a Massachusetts common law claim of fraud). See also *Zimmerman* v. *Kent*, 31 Mass. App. Ct. 72, 78 (1991), quoting from *Rogen* v. *Ilikon Corp.*, 361 F.2d 260, 266 (1st Cir. 1966), and citing Restatement (Second) of Torts § 538(2)(a) (1976). It is not enough that an "investor might find information interesting or desirable . . . to satisfy the materiality requirement." *Milton* v. *Van Dorn Co.*, 961 F.2d at 969. "The general standard of materiality . . . is as follows: An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important . . ." in deciding stock-related matters, *TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. at 449. Whether information is material is usually a question for the jury. *Id.* at 450.

That is not to say, however, that materiality can never be determined as matter of law. "Only if the established omissions are 'so obviously important to an investor that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law.' " *Ibid.* See also *Rogen* v. *Ilikon Corp.*, 361 F.2d at 265-267. In considering Mitchell's claim that he was entitled to judgment n.o.v., we

such a discount is not improper as matter of law. See *Shear* v. *Gabovitch*, 43 Mass. App. Ct. 650, 677-678 (1997). However, evidence of a minority discount in the sale of stock to a majority shareholder could be relevant to show fraud or self-dealing by a fiduciary. See *Demoulas* v. *Demoulas*, 428 Mass. 555, 567-569 (1998). On the other hand, Sheldon was not obliged to "offer more than an outside buyer might be willing to pay for a market-restricted minority position in a close corporation." *Shear* v. *Gabovitch*, *supra*.

apply this principle to the evidence considered in the light most favorable to Sheldon and Forman.

In taking up Mitchell's claim that the judge was in error in denying his motion for judgment n.o.v., we first consider his contention that he should have been informed of any impending non-cash distributions, that is, the distributions declared in November, 1994, and January, 1995. As established by the evidence, Mitchell was a minority shareholder in a closely held corporation with no ready market for his stock. Moreover, despite a number of suitors courting acquisition of Interface stock, there was nothing in the evidence to show a likelihood that Sheldon would sell the company at any time in the foreseeable future. In addition, during the five-year period during which Mitchell held the stock, it produced no income other than those amounts necessary for tax purposes. In short, Mitchell held a non-liquid asset which, notwithstanding its potential, showed no current economic benefit.

Finally, there was evidence to show that on November 30, 1994, and in January, 1995, when Interface declared distributions, it did so by deeming outstanding promissory notes paid. Had Mitchell owned his stock at the time of these distributions, the distribution to him would have been in the form of debt-forgiveness, a ten-year, interest-bearing promissory note not due for at least a decade, and funds to pay his income tax bills. The evidence supported the findings that the promissory note would not be paid until the time Comdex was sold and that such a sale was not contemplated at the time of Mitchell's sale of his stock to Sheldon.

On this evidence we cannot conclude as matter of law that Mitchell's prospect of receiving a paper asset, the profit from which was to be realized at some undetermined future time during which his personal debts would become due and owing, would have had a material or significant effect upon Mitchell's decision to sell his stock. Our conclusion is bolstered by Mitchell's own testimony concerning the distributions in dispute, that is, without the sale of Comdex, he "wouldn't have had anything."

Mitchell also argues that he was entitled to judgment because neither Sheldon nor Forman informed him that the purchase

price paid for his stock was not based upon its fair value per share, information which he insists was a nondisclosed material fact as matter of law. Although such information is relevant to any consideration of whether Mitchell was fairly paid for his stock, he is wrong in insisting that the allegedly withheld information entitled him to judgment as matter of law. See *Shear* v. *Gabovitch*, 43 Mass. App. Ct. 650, 677-678 (1997). We are here concerned with allegations of self-dealing. In a situation such as this, the adequacy of consideration is probative of the fairness of the transaction. See *Coggins* v. *New England Patriots Football Club, Inc.*, 397 Mass. 525, 533-534 (1986); *Demoulas* v. *Demoulas*, 428 Mass. 555, 566-569 (1998). See also *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 538, n.43 (1997).

As we see it, the real question before us is whether there was any basis in the evidence which would allow the jurors reasonably to find that any assumptions made by O'Connor in evaluating the purchase price of Mitchell's shares were not material because the actual purchase price paid by Sheldon was, in fact, fair and reasonable. The flaw in Mitchell's argument is that he presupposes that the evidence conclusively showed that the purchase price was unfair.

Mitchell offered nothing to show what he believed to be the true value of his stock as of the time he sold it to Sheldon. On the other hand, there was evidence to show that the purchase price offered by Sheldon to Mitchell was comparable to the price sought by Chafetz, a sophisticated insider, in exchange for both his and his family's interests in Interface and that Chafetz would have sold his Interface stock for the price Sheldon paid to Mitchell. Also, or alternatively, the jury could have credited the testimony of Gary, who had participated in the sale of his stock to Sheldon on terms identical to those presented to Mitchell, to the effect that he would have been content with the price paid by Sheldon but for the unanticipated sale of Comdex.

Aside from the issue of the materiality of the alleged nondisclosure of facts, there is additional support in the evidence as it relates to Mitchell's claim of entitlement to judgment on his allegations against Forman as cotrustee of the Mitchell Adelson Trust. Forman presented an expert witness who testi-

fied that Forman did not breach his fiduciary duty as trustee of Mitchell's trust. In reaching this opinion, the expert reviewed everything connected with Sheldon's purchase of Mitchell's stock, including the facts that: (1) Forman did not disclose to Mitchell the non-cash distributions; (2) Forman relied upon O'Connor's valuation of the company in arriving at the purchase price of the shares; (3) Forman took into account the fact that the sale of the stock would generate $3.1 million in principal in ten years and $210,000 in interest each year for ten years; and (4) Forman distributed the stock held in trust to Mitchell so that he could sell it to Sheldon. The expert witness further opined that if anyone was in breach of a fiduciary duty, that person would be Mitchell as cotrustee of the Mitchell Adelson Trust. The expert based his opinion on Mitchell's admitted failure to independently evaluate the adequacy of Sheldon's offering price prior to selling his stock to Sheldon. Based upon the evidence and the law, we conclude that the judge correctly denied Mitchell's motion for judgment n.o.v. on his claims that Sheldon and Forman had intentionally misrepresented or failed to disclose any material fact to him. See, e.g., *Birbiglia* v. *Saint Vincent Hosp., Inc.*, 427 Mass. 80, 83 (1998); *Netherwood* v. *American Fedn. of State, County & Mun. Employees, Local 1725*, 53 Mass. App. Ct. 11, 20 (2001).

3. *The jury instructions.* "The general rule is that one acting in a fiduciary capacity for another has the burden of proving that a transaction with himself was advantageous for the person for whom he was acting." *Cleary* v. *Cleary*, 427 Mass. 286, 291 (1998), quoting from *Witherington* v. *Nickerson*, 256 Mass. 351, 356 (1926). See *Geller* v. *Allied-Lyons PLC*, 42 Mass. App. Ct. 120, 125 n.8 (1997), and cases cited. The judge informed the jury that Sheldon, as a majority shareholder and director in Interface and irrespective of his familial relationship with Mitchell, had a fiduciary duty to Mitchell in transacting for the purchase of his stock, and he informed them of the nature and demands of that duty. He also instructed them that until Mitchell first presented evidence to show that Sheldon profited from the transaction as of the date of its occurrence, Sheldon had no burden of proving that he had fulfilled his fiduciary duty to Mitchell.

Mitchell argues that although the judge correctly instructed the jury that Sheldon was his fiduciary, he erroneously refused to instruct the jury that it was Sheldon's burden, as a fiduciary, to establish that his purchase of Mitchell's stock was fairly and equitably conducted in every respect without any burden on Mitchell's part first to produce evidence that Sheldon profited from the transaction. As support for this argument, Mitchell relies on *Smith* v. *Smith*, 222 Mass. 102, 106 (1915), wherein the court stated:

> "It often has been said that where a conveyance is made to one occupying a fiduciary relation, it is presumed to have been executed by reason of that relation and not to have been a transaction as between strangers, and the burden of proof is placed upon the grantee to prove that the transaction was fair and just to the grantor and was not procured through fraud or undue influence."

Sheldon counters that because his transaction with Mitchell did not require him to exercise any of his corporate responsibilities, he had no fiduciary duty to Mitchell who, consequently and as the judge instructed, bore the burden of proof. As noted in *Cleary* v. *Cleary*, the "*Smith* case . . . stands for the unremarkable proposition that a contestant bears the burden of proof if no fiduciary relationship is shown." 427 Mass. at 294. Whether the judge erroneously placed the burden of proof on Mitchell rather than Sheldon turns on the question whether he correctly instructed the jury that Sheldon owed a fiduciary duty to Mitchell. See *Cleary* v. *Cleary*, 427 Mass. at 292 (the "first question . . . is whether [Sheldon] owed a fiduciary duty to [Mitchell]")."

There is no doubt that Sheldon owed Mitchell a fiduciary duty in respect to the operation of Interface, a close corporation. See *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 592-594 (1975); *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 529 (1997), both citing to and quoting from *Meinhard* v. *Salmon*, 249 N.Y. 458, 463-464 (1928). There is, however, nothing in *Donahue* or its progeny, including *Demoulas* v. *Demoulas Super Mkts., Inc.*, *supra*, which suggests

that shareholders in a closely held corporation owe one another a duty of the utmost good faith and loyalty in any dealings beyond the operation of the corporate enterprise. See *Donahue, supra* at 593 n.18. Mitchell, however, does not claim, nor is there evidence to show, that Sheldon was in breach of his duty of utmost good faith and loyalty in a matter of corporate governance.[16] Rather, the evidence presented shows a personal transaction between a father and his adult son who was free to ask corporate insiders, and anyone else for that matter, for information bearing upon the value of his stock.

Moreover, a general rule is that in the absence of special circumstances, directors have no special duty to individual stockholders when purchasing their stock, irrespective of whether the stock was traded on the exchange or purchased by a family member in a personal sale. Cf. *Goodwin* v. *Agassiz,* 283 Mass. 358, 361, 363-364 (1933); *Gladstone* v. *Murray Co.,* 314 Mass. 584, 587-588 (1943). Whatever the circumstances that could create a duty to a shareholder when a director personally solicits him for the purchase of stock without first making disclosure of material and non-public information affecting the value of the stock, we have no evidence before us which gives rise to any such duty. See *Goodwin* v. *Agassiz,* 283 Mass. at 263, citing *Gammon* v. *Dain,* 238 Mich. 30, 32 (1927).[17]

Mitchell testified that he could have, but did not, ask Sheldon or any other knowledgeable corporate insiders for any information bearing upon the value of his shares, e.g., the financial condition of Interface, corporate earnings, indebtedness, and offers to purchase the company. Also, and as previously indicated, the jury found that Sheldon neither intentionally misrepresented nor failed to disclose to Mitchell any material fact in respect to Sheldon's purchase of Mitchell's stock.

---

[16]Indeed, Mitchell took no objection to the judge's instruction that Sheldon's fiduciary duty was based upon the fact that Sheldon was a director of and majority shareholder in Interface and that any familial relationship was irrelevant.

[17]We are not unmindful of the burden shifting required in equity cases as noted in *Cleary* v. *Cleary,* 427 Mass. at 295 n.5. Rather, we look to *Goodwin, supra,* and *Gladstone, supra,* only as illustrative of circumstances which could give rise to a fiduciary duty and not as pertinent authority for the burden of proof.

Because there was no evidence to show that Sheldon owed Mitchell either a fiduciary or special duty, any error in the judge's instructions about which Mitchell complains did not affect his substantive rights and was, therefore, harmless. See *Hopkins* v. *Medeiros*, 48 Mass. App. Ct. 600, 610 (2000).

4. *The claims for equitable relief.* As the judge's findings of fact are not clearly erroneous, we accept them. See *Yankee Microwave, Inc.* v. *Petricca Communications Sys., Inc.*, 53 Mass. App. Ct. 497, 504 (2002), and cases cited. For the reasons set out in parts 2 and 3 of this opinion, *supra*, we see no error in the judge's conclusions of law and dismissal of Mitchell's claims seeking equitable relief.

*Judgment affirmed.*

*Order denying plaintiff's motion for postjudgment relief affirmed.*