Connors, Thomas A., J.
Trustees Neil S. Puro, Lynn Cabot-Puro, Robert Sage, and William Sage (collectively, the Trustees) of the Boston Motor Hotel Trust (the Trust) instituted this action for, among other relief, a declaratory judgment in order to resolve a dispute with the minority shareholders of the Trust, Barbara Popkin, James D. Popkin, and the Sandra Wheeler Revocable Trust (collectively, the Popkins). In response to the lawsuit, the Popkins filed a Supplemental Counterclaim against the Trustees and the Trust. A disagreement involving oral representations allegedly made to James D. Popkin and Sandra Wheeler by Robert Sage (Sage) lies at the heart of the controversy in this case. On their motion for partial summary judgment, the Trustees seek dismissal of the declaratory relief (Count V), breach of fiduciary duty (Count VI), and promissory estoppel (Count VIII) claims asserted in the Popkins’ Supplemental Counterclaim. In connection with the requested disposition, the Trustees also urge the court to resolve their underlying claim for declaratory relief by holding that the latest extension of the duration of the Trust was valid and effective. The Popkins oppose the motion. For the following reasons, the Trustees’ Motion for Partial Summary Judgment is DENIED.
BACKGROUND
After a hearing and upon review of the parties’ submissions, the court finds that the following facts are not in dispute.
Together with Fenway Motor Hotel, Inc., the Boston Motor Hotel Trust was organized on or about February 2, 1959, for the purpose of owning and operating a hotel near Fenway Park in Boston, Massachusetts. The real estate on which the hotel is located is the sole asset of the Trust. The hotel has operated continuously since its inception under various names. Currently, it is a Howard Johnson’s Hotel. Robert Sage is the only party to this action who was an original trustee and shareholder. The Popkins and Puros being members of the second generation of shareholders in the Trust, the Popkin and Sage families were particularly close at the time the Trust was formed, having socialized and conducted business together since the 1930s. Ownership of the Trust is divided into two categories of security interests: Class A and Class B shares. In addition to comprising the board of trustees, the Puros and the Sages dominate the Trust’s ownership interests. Collectively, they hold all of the outstanding Class A shares and seventy percent of the outstanding Class B shares.[4]
The origins of the parties’ dispute can be traced to February 1, 1984, when the term of the Trust was inadvertently permitted to lapse. In an effort to give the Trust the legal effect of uninterrupted operation in spite of its lapse, the trustees drafted and executed a substitute Agreement and Declaration of Trust (Declaration) on October 28, 1985. They also drafted a Memorandum of Understanding (MOU) in conjunction with the substitute Declaration. In pertinent part, the MOU stated:
All the Shareholders and all the Trustees have agreed to extend the Trust for an additional 25-year period until February 2, 2009, such agreement being effective as of Februaiy 2, 1984 fully to the same extent as if an instrument amending the Trust were duly executed, acknowledged, recorded with Suffolk Registry of Deeds and filed with the Massachusetts Secretary of State of said date.
Pursuant to the MOU all the shareholders had to agree that the “new” trust was merely an extension of the predecessor trust. Otherwise, the predecessor trust would have been deemed to have lapsed, and the trustees feared that they would have been required to either liquidate its assets and distribute them to the shareholders, or negotiate a buy-out of the non-assenting shareholders.
In 1983, approximately one year before the Trust lapsed, the Popkins’ mother, Dorothy Popkin, had *42 died. She was an original beneficiaiy of the Trust, and she had owned approximately a fifteen-percent share of outstanding Class B stock. Each of her three children received a one-third share of her interest in the Trust after her estate was probated. Consequently, when the trustees were seeking to ratify the MOU in 1985, the Popkins’ consent to the reinstatement of the predecessor trust was mandatory. Wary that assenting to the MOU would lock them into a long-term reinvestment of their newly realized inheritance, the Popkins contend that they consulted Sage about the flexibility of the commitment. Specifically, the Popkins were concerned about having access to the assets during their retirement. James D. Popkin claims that in a conversation in October 1985, Sage assured him that if the Trust wasn’t liquidated by 2009, their shares would be bought out.[5] According to Sandra Wheeler, a similar exchange occurred between her and Sage.[6] Thereafter, the Popkins agreed to execute the MOU, allegedly in reliance on Sage’s statements.
Beginning as early as 1994, the Popkins were approaching Sage informally about ways to liquidate their shares in the Trust. Sage, however, was interested in attracting joint venturers to redevelop the property at that time. While negotiating with the outside investors, he had represented to the shareholders that any agreement was contingent upon the provision of an exit strategy for those who did not wish to invest in the project. None of these negotiations, however, bore fruit. Meanwhile, the parties’ relationship had deteriorated. Despite the Trust’s financial strength, dividends had not been paid regularly. The Popkins had begun to perceive what they viewed as impropriety in the Trust’s retention of Sage’s private management company to manage its affairs. Distrustful of Sage’s intentions, the Popkins secured legal representation in 1999 to formally initiate buy-out discussions with the Trust and to protect their interests in the event Sage consummated one of the joint ventures that he was exploring.
In 2005, the Trust was close to an agreement with the Boston Red Sox and with other entities to construct a new hotel on the Boylston Street property. The proposed joint venture contemplated a twenty-year investment period with an expected return of equity in eleven years, subject to favorable refinancing terms. Because of the risk profile of the development plan and the extended investment horizon, the Popkins did not favor the project. Nevertheless, the Trustees voted to approve entering into the agreement over the Popkins’ objections on October 25, 2005. The Popkins threatened to bring a lawsuit to prevent the Trustees from participating in the joint venture. As a result, the Trustees sought to clarify their authority to proceed with the project on the Trust’s behalf by preemptively filing this action in March 2006 seeking declaratory relief. The Popkins answered by filing their counterclaim which alleged breach of fiduciary duty, among other claims. The case was thrust into a different posture on December 20, 2006, however, when the Sages and Puros, in their capacities as both trustees and majority shareholders, voted to extend the life of the Trust another fifty years, or until 2059. The vote took place without the Popkins’ knowledge or consent. Subsequently, the parties amended their complaint and supplemented their counterclaim to reflect the questions currently before the court: whether the Sages and Puros validly had extended the life of the Trust, and, if so, whether that extension was nullified or estopped as a consequence of the representations Sage had made to the Popkins in 1985.
On the Trustees’ Mass.R.Civ.P. 12(b)(6) Motion to Dismiss the Popkins’ counterclaims, this court granted the Trustees partial relief but left the substance of the Popkins’ claims intact. Looking to the MOU and the Declaration of Trust, this court found that there was nothing in the terms of those documents that barred amendments perpetuating the life of the Trust. The breach of contract claim was dismissed, therefore, on the basis that the Trustees had acted within their authority.[7] However, this court declined to dismiss the breach of fiduciary duty or promissory estoppel claims, holding that the Popkins’ allegations, if proven, could support the findings that they had a reasonable expectation that the Trust would not be extended beyond 2009, and that the Trustees thereby were estopped from effectuating such an extension.
DISCUSSION
Summary judgment is appropriate when there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Mass.R.Civ.P. 56(c); see Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating that there are no genuine issues of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). To satisfy this burden, the moving party must submit affirmative evidence that negates an essential element of the opposing party’s case, or it must demonstrate that the opposing party has no reasonable expectation of proving an essential element of the case at trial. Kourouvacilis v. Gen. Motors Corp., 410 Mass. 706, 716 (1991). The court reviews the evidence and draws all justifiable inferences therefrom in the light most favorable to the non-moving party. G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991).
The burden is on the Trustees as the moving party to show that the Popkins’ counterclaims do not present any genuine issues of material fact with respect to Sage’s representations and the faithful observance of his fiduciary duties. The Trustees do not dispute that Sage made certain statements to the Popkins regarding the duration of the Trust.[8] Rather, the Trustees contend that the Popkins’ alleged reliance on those representations cannot be deemed reasonable as a *43 matter of law. The Trustees also contend that Sage’s statements do not implicate his duties as a fiduciary as a matter of law. However, this court has already addressed Sage’s fiduciary status in its decision on the Trustees’ Rule 12(b)(6) motion. There, the court ruled that the Popkins had stated a claim for breach of fiduciary duty, provided that they could establish their factual allegations at trial. The Trustees have failed to carry their burden of proving that no genuine issues exist with respect to those factual allegations. In spite of the Trustees’ submissions, the court cannot find, as a matter of law, that the Popkins were not justified in relying on Sage’s assurances and in expecting their involvement in the Trust to cease in 2009. The reasonableness of the Popkins’ reliance and expectations, therefore, must be decided by a jury.
It is well established that closely held entities like the Trust are unique and require special treatment in certain circumstances. See Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 586 (1975) (defining a close corporation); see also Harvard Coll. v. Amory, 26 Mass. 446, 469 (1830) (addressing the fiduciary duties owed by the trustee of a closely held trust). Due to the nature of close corporations, minority shareholders may find themselves at the mercy of the majority shareholders. They are vulnerable to being “locked in” to a disadvantageous situation, or “frozen out” of fulfilling their reasonable expectations of ownership. See Brodie v. Jordan, 447 Mass. 866, 869 (2006). As a result, Massachusetts law imposes on shareholders in close corporations “substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another,” a duty of “utmost good faith and loyalty.” Donahue, 367 Mass. at 593.
When deciding whether to grant relief to aggrieved minority shareholders in close corporations, Massachusetts courts have analyzed the position of the particular shareholders in terms of their reasonable expectations, both implicit and explicit. Brodie, 447 Mass. at 869. Minority shareholders have recovered when their expectations of decision-making or control, employment with the entity, or the ability to sell shares on the open market have been undermined. See id. at 870; Bodio v. Ellis, 401 Mass. 1, 10 (1987); Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 850 (1976). As long as the expectations of ownership benefits are reasonable, the majority’s frustration of minority expectations may constitute a breach of fiduciary duty.[9] Brodie, 447 Mass. at 869-70.
Similarly, recovery under a theory of promissory estoppel also turns on the reasonableness of the detrimental reliance. Kanamaru v. Holyoke, 72 Mass.App.Ct. 396, 405 (2008) (citations omitted). Here, the Popkins were minority shareholders in a closely held organization. They expected that their investments in the Trust would have some liquidity by the time the Trust was due to expire in 2009, and those expectations were formed in reliance on Sage’s 1985 statements. The Trustees attack both the reasonableness of the Popkins’ expectations and their reliance on Sage’s statements.
In support of their arguments, the Trustees have produced deposition testimony which they contend sheds light on the states of mind of the Popkins when they agreed to reinstate the Trust in 1985, and in the course of business thereafter. For instance, the Pop-kins, with the exception of Sandra Wheeler, conceded that they did not recall reading the MOU or Declaration of Trust, or obtaining professional advice, prior to signing those documents. They agreed to the MOU with the knowledge that the Trust was negotiating to buy back the Puros’ class B stock, potentially increasing the proportion of the Popkins’ ownership share. However, the Popkins did not inquire into the value of those shares, and they had no expectations of the shares’ future values, including dividends and other monetary distributions that might be paid by the Trust. Since the conversation with Sage in 1985, the Popkins have not discussed with the Trustees the prospect that they might exercise their power to extend the life of the Trust. Rather, the Popkins have participated in plans for potential redevelopment of the Trust property and conversion of the Trust’s corporate form, both of which contemplated the persistence of the Trust itself beyond 2009. The Trustees also point to the Popkins’ involvement as directors of the Trust’s sister corporation, the Fenway Motor Hotel, Inc., and to their cooperation in furthering the corporation’s long-term objectives.
The Trustees marshal and deploy these facts in an effort to portray the Popkins as disinterested and uninformed shareholders at best, and oblivious at worst. According to the Trustees, the Popkins’ own testimony demonstrates that they could not have reasonably formed any expectations about the duration of the Trust in 1985 because of their sheer ignorance regarding the nature of their investment. However, it is exactly the fact of the Popkins’ asserted inexperience which would lead to an inference that reliance upon Sage’s representations was reasonable. The Popkins had just recently inherited their mother’s interests in the Trust when Sage asked them essentially to reinvest those assets for another twenty-five years. They did not have any prior involvement in the Trust and had no knowledge of how it functioned. Sage, on the other hand, was an authority with extensive experience operating the Trust. Not only was Sage perceived as trustworthy by virtue of his legal obligations as a fiduciary, but he was also a long-time family friend and business partner. This case is not one in which there were suspicious circumstances surrounding the representations, see Collins v. Huculak, 57 Mass.App.Ct. 387, 392-93 (2003), or where the representations obviously contradicted the terms of the contract, see Kuwaiti Danish Computer Co. v. Digital Equip. Corp., *44 438 Mass. 459, 468-69 (2003). The parties were not sophisticated negotiators dealing at arms length, see Cataldo Ambulance Serv., Inc. v. Chelsea, 426 Mass. 383, 387 (1998), and there are no policy grounds compelling the court to find that the Popkins’ reliance was unreasonable, see Sound Techniques v. Hoffman, 50 Mass.App.Ct. 425, 430-34 (2000). Here, the evidence suggests that the Popkins were susceptible to Sage’s influence when they agreed to the MOU in 1985, and the testimony produced by the Trustees does not eliminate the possibility that a reasonable juiy could conclude that, in the circumstances, the Popkins reasonably relied upon Sage’s representations in forming expectations as to the duration of their investments.
The Trustees contend that the Popkins’ conduct after signing the MOU implied that they knew that long-term redevelopment was in the best interests of the Trust, and, consequently, their continued expectations that the Trust would terminate in 2009 was unreasonable and even disingenuous. The inferences the Trustees have drawn from the Popkins’ participation in the Trust’s affairs is only one of several alternative explanations, however. It is possible, for instance, that the Popkins cooperated in order to avoid breaching any legal obligations they owed to the other shareholders. Further, the Trustees’ theory overlooks the fact that, ultimately, the Popkins did obstruct the ■ Trust’s involvement in a long-term joint venture. Their argument also fails to take into account the Popkins’ efforts to sell their interests in the Trust while they simultaneously fulfilled their duties as shareholders. The two courses of conduct are not mutually exclusive and do not necessarily suggest conflicting motivations. Regardless, the mere fact that at certain times the Popkins appeared to acquiesce in plans which extended beyond 2009, is insufficient to show that their expectations of the eventual liquidation of their financial interest in the Trust by 2009 was unreasonable as a matter of law.
The Trustees, citing to the Supreme Judicial Court’s decision in Chokel v. Genzyme, 449 Mass. 272, 275-76 (2007), argue that Sage’s representations to the Popkins regarding the duration of the Trust should be viewed in light of those provisions of the MOU and Declaration of Trust that allow for the Trust’s extension. In Chokel, the reasonableness of the parties’ expectations were construed only as broadly “as the contract that govern [ed] [their] particular relationship.” Id. at 276. The primary claim at issue in Chokel however, was one for breach of the implied covenant of good faith and fair dealing arising from the contractual relationship between the corporation and its shareholders under the corporation’s articles of organization. Id. The entity in that case was a publicly traded company with a ready market for its shares. By contrast, the Popkins’ claim for breach of fiduciary duty arises from the nature of the closely-held Trust and is independent of the express contents of the MOU or the Declaration of Trust. The reasoning in Chokel therefore, is inapplicable, and the Popkins’ expectations that the Trust would expire by 2009 cannot be considered unreasonable simply because the Trust documents did authorize such renewal.
Finally, the Trustees raise the question of whether Sage was acting within his capacity as a fiduciary when he made the 1985 representations. The Appeals Court observed in Adelson v. Adelson, 60 Mass.App.Ct. 753, 768 (2004), that there is nothing in Massachusetts corporate common law that “suggests that shareholders in a closely held corporation owe one another a duly of the utmost good faith and loyalty in any dealings beyond the operation of the corporate enterprise.” The Trustees compare Sage’s conduct to the alleged fraud and misrepresentations of the corporate director in Adelson, who had purchased company stock from his son, the plaintiff, at a favorable price. The Adelson court held that no fiduciary obligations attached to the sale, which it described as “a personal transaction between a father and his adult son who was free to ask corporate insiders . . . for information bearing upon the value of his stock.” Id. at 768.
The problem with the Trustee’s analogy is that Sage was not simply engaging in a “personal transaction” with the Popkins; instead, his representations to them about the Trust were concerned precisely with “the operation of the corporate enterprise.” The Adelson decision stands for the general proposition that “directors have no special duty to individual stockholders when purchasing their stock.” Id.; but see Johnson v. Witkowski, 30 Mass.App.Ct. 697, 704 (1991) (“While a fiduciary may purport to wear one hat at a particular moment, in truth, all hats are worn together at all times”). The principle has little application to these facts. Indeed, soliciting trust beneficiaries’ consents to the reorganization of the Trust and forecasting the extent of their involvement as shareholders are fundamental aspects of the Trust’s governance. In this context, Sage cannot avoid the legal effect of his words by claiming to have simply removed his fiduciary “hat” when he made such critical representations to the Popkins.
CONCLUSION
The record indicates that the Popkins did not earn salaries from the Trust, and that dividends were paid irregularly. If their testimony is to be credited, and it must be for the purposes of this motion, the Popkins expected that the primary return on their investment in the Trust would derive from the ultimate liquidation of their interests by 2009. Those expectations were clearly frustrated by the extension of the Trust until 2059. When Sage assured the Popkins in 1985 that within twenty-five years either he would purchase their shares or the hotel would be sold and the Trust assets liquidated, he did so as a fiduciary, and the Trustees have not produced sufficient evidence to show that the reliance or expectations induced by *45 Sage’s representations were unreasonable as a matter of law. Accordingly, the Trustees are not entitled to summary judgment on the Popkins’ claims of breach of fiduciary duty and promissory estoppel, and the court must decline the Trustees’ request for a declaration regarding the propriety of the Trust’s 2006 extension pending the resolution of the Popkins’ counterclaims.
ORDER
For the foregoing reasons and pursuant to Mass.R.Civ.P. 56(c), the plaintiffs’ Motion for Partial Summary Judgment on Counts V, VI, and VIII of the defendants’ Supplemental Counterclaim is DENIED.

Specifically, all of the outstanding Class A shares are controlled by Neil S. Puro and Lynn Cabot-Puro. With respect to the Class B shares, Robert Sage owns 91 shares, or seventy percent of the outstanding 130 shares. Barbara Popkin, James D. Popkin, and the Sandra L. Wheeler Revocable Trust each own thirteen shares of the remaining Class B security interests.

With respect to the alleged conversation, James D. Pop-kin testified at his deposition that,
[h]e [Sage] said [the Trust] would only be for a period of 25 years ... so I said, you know, Bob, this puts us in a retirement age and ... I look at this as my retirement. I said, are you sure that this is not going to go beyond that time period. And Bob told me not to worry, that he would either buy [the Popkins] out at some point or the hotel would be sold within that time period or at the end of the [twenty-five-year] term the assets would be liquidated. And I said, as far as I was concerned if that was going to happen, I was in agreement with it. And he reassured me that it would not go beyond.

At her deposition, Sandra Wheeler (née Popkin) testified that she and Sage “talked about [her] concerns [about the twenty-five-year extension], and he said to [her], not to worry, he would buy [her] out at any time [she] wanted to be bought out or at the end of the twenty-five years the Trust would be sold and the assets liquidated.” Barbara Popkin admits that she never spoke directly to Sage about the duration of the Trust, but she claims in her affidavit that her brother James had related to her the details of his conversation with Sage, and that she relied on Sage’s representations when she agreed to sign the MOU.

Under the Trust’s express terms, an amendment is effective with the assent and approval of two-thirds of the outstanding shares. Both parties acknowledged that the Trustees possessed the requisite amount of shares at the time they passed the amendment.

For the purposes of their motion, the Trustees have stipulated to the facts as testified to by the Popkins in their depositions.

The principle has two caveats, the applications of which present genuine issues of material fact. When there is no evidence that the majority stockholders acted out of a desire to increase their financial gain in the corporation, there is no breach of fiduciary duty. See Vakil v. Anesthesiology Assocs. of Taunton, Inc., 51 Mass.App.Ct. 114, 118 (2001). In addition, “[w]here the alleged wrongdoer can demonstrate a legitimate business purpose for his action, no liability will result. . .[,]” unless there was a less harmful and reasonably practical alternative. O’Brien v. Pearson, 449 Mass. 317, 385 (2007) (citations omitted). The Trustees argue generically that the 2006 extension of the Trust allows the trust’s purposes to continue to be fulfilled. The Popkins’ submissions call into question both the wisdom of the extension and the motives behind it, and the court finds that a genuine dispute exists regarding the legitimacy of the Trustees’ course of conduct and the available alternatives, including dissolution.