JEFFREY D. CHOKEL *vs.* GENZYME CORPORATION & others.[1]

Suffolk. December 4, 2006. - June 4, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Practice, Civil,* Motion to dismiss, Amendment, Complaint. *Corporation,* Stockholder, Stock, Board of directors. *Contract,* Implied covenant of good faith and fair dealing, Performance and breach. *Fiduciary.*

A Superior Court judge properly dismissed an action brought by the plaintiff shareholder against the board of directors of the defendant corporation based on their exchange of one corporate division's stock for general division stock (an action permitted under the articles of organization), where there was no breach of the implied covenant of good faith and fair dealing, given that the directors did not violate shareholders' reasonable expectations in announcing the exchange of stock [275-278], and where no breach of fiduciary duty claim could stand, given that the directors' contested action fell entirely within the scope of the terms agreed to in the articles of organization [278].

This court declined to review the propriety of a judge's denial of a plaintiff's motion to amend his complaint in a civil action, where the plaintiff failed to include the request to amend in his record appendix on appeal; likewise, this court would not review motions seeking to set aside the judgment of dismissal based on the allegedly improper denial of the motion to amend, which was not before the court. [278-280]

CIVIL ACTION commenced in the Superior Court Department on May 27, 2003.

Motions to dismiss and for reconsideration were heard by *Allan van Gestel,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*John D. Donovan, Jr. (Robert G. Jones* with him) for the defendants.

*Robert C. Schubert (Douglas M. Brooks* with him) for the plaintiff.

[1]Victor J. Dzau; Connie Mack, Third; Henri A. Termeer; Douglas A. Berthiaume; Henry E. Blair; Constantine E. Anagnostopoulos; Robert J. Carpenter; and Charles L. Cooney.

CORDY, J. Jeffrey D. Chokel owned shares of Genzyme Corporation's biosurgery division tracking stock (biosurgery stock). On May 8, 2003, Genzyme announced the decision of its board of directors to exercise an exchange provision of Genzyme's articles of organization (articles), thereby triggering an exchange of the company's biosurgery stock for Genzyme general division stock. For purposes of the exchange, the fair market value and exchange ratio of the biosurgery stock were determined by a formula laid out in Genzyme's articles. On May 27, 2003, Chokel filed a complaint on behalf of himself and all others similarly situated, claiming that the directors committed a breach of their fiduciary duty to the holders of the biosurgery stock, and the covenant of good faith and fair dealing implied in the articles, by timing the exchange to occur when the biosurgery stock was substantially undervalued and had just begun to rise in response to positive news about the prospects of the biosurgery division.

A judge in the Superior Court granted the directors' motion to dismiss both claims pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), and denied Chokel the opportunity to amend the complaint. On appeal, the Appeals Court affirmed the dismissal of the fiduciary duty claim, reversed dismissal of the claim for breach of the implied covenant of good faith and fair dealing, and did not reach the issue of leave to amend. We granted the directors' application for further appellate review. We affirm the Superior Court's judgment of dismissal and denial of leave to amend.

1. *Background.* In reviewing the dismissal of a complaint for failure to state a claim, we take as true "the allegations of the complaint, as well as such inferences as may be drawn therefrom in the plaintiff's favor." *Blank* v. *Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 407 (1995). We recite the facts accordingly.

Genzyme is a biotechnology corporation, organized under the laws of Massachusetts. Its stock is publicly traded. In December, 2000, it issued a series of common stock to track its biosurgery division.[2] The biosurgery division was devoted to developing products related to the prevention and repair of tissue injury, as

---

[2] By the end of 2000, Genzyme had a capital structure that included series of common stock designed to track the performance of three divisions of the

well as other biosurgery fields. The division was not a legal entity separate from Genzyme. While the value of the biosurgery stock was intended to reflect the operations and assets of the biosurgery division, "tracking" its performance, the holders of the stock were stockholders of Genzyme. They did not own an undivided or fractional interest in the assets or business of the biosurgery division.

The biosurgery stock did not fare well in the marketplace, despite the increasing success of the biosurgery division, including the development of several promising products and decreasing operating losses between 2000 and 2003. After an initial price of $11 per share in December, 2000, the stock price gradually declined to an all-time low of $1.15 per share on April 10, 2003. On April 16, 2003, Genzyme reported substantial revenue growth for the biosurgery division in the quarter ending March 31. This strong performance was better than, but consistent with, the positive "financial guidance" for 2003 released by the biosurgery division on February 4, 2003. In response to the April 16 report, the price of the biosurgery stock began to rise, climbing from $1.41 per share on April 15, just before the report, to $2.51 per share on May 8, the date the exchange was announced.

Three months prior to the announcement of the exchange, in February, 2003, the directors concluded that the performance of the biosurgery stock did not reflect the success and prospects of the biosurgery division. At the February board meeting of the directors, they began to plan for Genzyme's acquiring all outstanding shares of the biosurgery stock. Later that month, they formed a capital structure committee of board members to pursue the plan. In March, 2003, the capital structure committee retained independent financial advisors to study and opine on the financial fairness of an exchange of biosurgery stock for Genzyme general division stock as provided in the articles. At the next meeting of the board on May 8, 2003, the exchange was publicly announced.[3]

company. There were tracking stocks outstanding for each of its general division, biosurgery division, and molecular oncology division. These tracking stocks were registered under the Securities Exchange Act of 1934, traded over the counter, and quoted on the NASDAQ National Market Systems.

[3]On May 8, 2003, Genzyme also announced that all outstanding shares of

Genzyme's articles provide that its directors "may at any time" exchange the outstanding shares of Genzyme's biosurgery stock for Genzyme general division stock. In the event of an exchange, the "Fair Market Value" of each stock is defined by the articles to be the average of the stock's price during a period of twenty consecutive business days commencing thirty days before the exchange is publicly announced. A holder of biosurgery stock is to receive shares of general division stock equal to 130 per cent of the fair market value of the biosurgery stock.

Based on the May 8 announcement date, the valuation period as defined in the articles began on March 26 and ended on April 23. This period included fifteen business days before the favorable quarterly report, when biosurgery stock was trading at or below $1.41 per share, and five days after the report, during which time price of the stock rose from $1.41 per share to $1.85 per share. The average price (or "fair market value") of biosurgery stock over the valuation period was $1.36 per share. Consequently, its exchange value (130 per cent of fair market value) was $1.77 per share. Even with the thirty per cent premium that the exchange ratio provided, the exchange value of the stock was seventy-four cents per share below the $2.51 share price of the stock on the day the announcement was made.

The complaint alleges, and for purposes of this appeal we must assume, that insofar as the directors' individual stock holdings included more Genzyme general division stock than biosurgery stock, they benefited individually from the lower exchange price, that the date on which the exchange was announced was chosen to take advantage of the depressed price of the biosurgery stock during the period before the April 16 favorable earnings report, and that at the exchange price the biosurgery stock was substantially undervalued relative to its intrinsic worth and prospects.

2. *Discussion.* a. *Implied covenant of good faith and fair dealing.* Under Massachusetts law, a corporation's articles of organization form a contract between the corporation and its shareholders. See *Jessie* v. *Boynton*, 372 Mass. 293, 303 (1977).

its molecular oncology tracking stock would be similarly exchanged, and that the company would have only one outstanding series of common stock.

Insofar as every contract in Massachusetts is subject to an implied covenant of good faith and fair dealing, *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 473 (1991), the directors were bound to act accordingly with respect to the performance of the obligations created in the articles. The purpose of the implied covenant is to ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract, *id.* at 471-472, and that, when performing the obligations of the contract, the parties "remain faithful to the intended and agreed expectations" of the contract, *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). A breach occurs when one party violates the reasonable expectations of the other. *Id. Cadle Co.* v. *Vargas*, 55 Mass. App. Ct. 361, 366 (2002), quoting Restatement (Second) of Contracts § 205 (1979). However, "[t]he scope of the covenant is only as broad as the contract that governs the particular relationship." *Ayash* v. *Dana-Farber Cancer Inst.*, 443 Mass. 367, 385, cert. denied sub nom. *Globe Newspaper Co.* v. *Ayash*, 546 U.S. 927 (2005). The covenant does not supply terms that the parties were free to negotiate, but did not, *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, *supra* at 388, nor does it "create rights and duties not otherwise provided" for in the contract, *Ayash* v. *Dana-Farber Cancer Inst.*, *supra*, quoting *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, *supra* at 385.

Chokel claims that the directors committed a breach of the contract between Genzyme and the holders of the biosurgery stock when they announced the exchange of stock on May 8, 2003. He argues that the implied covenant of good faith and fair dealing required them to exercise the exchange provision at a time that would "create a valuation period in which the market has absorbed all material publicly disclosed information," and therefore reflect the "true" fair market value of the stock. Essentially, Chokel contends that, in order for the biosurgery shareholders to receive the intended and agreed expectations of their contract, the directors were required to delay the announcement of any exchange until a moment when, for each day of the preceding valuation period, the information publicly known on that day was the same as the information that was publicly known on the date of announcement. We disagree.

The holders of the biosurgery stock could not reasonably have understood or expected that the directors would be limited in such a manner. First, it is contrary to the explicit authority of the directors to declare an exchange "at any time," which, at a minimum, contemplates an exchange that could occur when the stock price is rising or falling.[4] Second, it adds new requirements and undue complexity to the directors' exercise of their authority under the articles. Third, and most important, it assumes that the "intended and agreed expectations" of the parties to the contract included some higher return beyond the exchange value specifically provided to the biosurgery stockholders in the articles. The biosurgery stockholders could not reasonably have expected any "fruits of their contract" other than that they would receive 130 per cent of the value of their stock as calculated in accord with the articles, whenever the exchange option was exercised. To conclude otherwise would lead to uncertainty where the articles are clearly intended and structured to provide certainty and predictability.

In sum, to read into the articles an intention that biosurgery shareholders would receive a value (the "true" market value) for their stock only as that value is measured at certain favorable moments would be to create an expectation beyond its terms, and to change the governance of the corporation in material ways. In the context of a publicly traded corporate enterprise where potentially conflicting stockholder interests are often present, and directors need be free to exercise business judgments they believe are in the "best interests of the corporation," and to rely on information, opinion, and reports of persons

---

[4]Chokel argues that our reliance on the express provision allowing for an exchange "at any time" is at odds with our holding in *Fortune* v. *National Cash Register Co.*, 373 Mass. 96 (1977). There we held that a violation of the implied covenant can be found in the abusive timing of contractual performance that nevertheless falls within the express provisions of the contract. We concluded that even an "at will" employment contract could not be terminated at a moment chosen solely to avoid paying money due an employee for work already performed by him. *Id.* at 105. We concluded that such an abuse of an "at will" employment contract was in bad faith, and so was a violation of the implied covenant of good faith and fair dealing. *Id.* In contrast, here the inclusion of an "at any time" provision, when coupled with the averaging period for determining fair market value and the thirty per cent premium, suggests that the reasonable expectations of the parties included the possibility that the exchange could occur when the stock was either rising or falling.

with "professional or expert competence," such an expectation is unreasonable, and not protected by the implied covenant of good faith and fair dealing.[5,6] See G. L. c. 156B, § 65.

b. *Fiduciary duty of the directors.* Directors owe a fiduciary duty to their shareholders. See *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 528-529 (1997). When rights of stockholders arise under a contract, however, the obligations of the parties are determined by reference to contract law, and not by the fiduciary principles that would otherwise govern. When a director's contested action falls entirely within the scope of a contract between the director and the shareholders, it is not subject to question under fiduciary duty principles. *Blank* v. *Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 408 (1995). In this case, the procedure for exchanging stocks falls squarely within the contract, and any obligations the directors owe to Chokel derive from and are limited by the terms agreed to in the articles. See *id.* at 408-409.

Even accepting as true the well-pleaded allegations in the complaint and inferences as may be drawn in Chokel's favor, there are no provable set of facts that would entitle Chokel and the class he represents to relief on either the breach of implied covenant or breach of fiduciary duty claims. *Warner-Lambert Co.* v. *Execuquest Corp.*, 427 Mass. 46, 47 (1998). See *Harvard Law Sch. Coaliton for Civil Rights* v. *President & Fellows of Harvard College*, 413 Mass. 66, 68 (1992).

c. *Amended complaint.* Finally, Chokel argues that the judge abused his discretion under Mass. R. Civ. P. 15 (a), 365 Mass.

---

[5]The complaint contains no allegations that the directors withheld information with the intention of depressing the price of biosurgery stock. Nor is there any allegation or suggestion in the complaint that the dramatic diminution in value (from $11 to $1.15) experienced by the biosurgery stock was due to anything more than the risk of the marketplace, or that, in light of that diminution, the decision to exercise the exchange option as soon as practicable was not in the best interests of the corporation.

[6]Chokel's contention that allegations of bad faith must always be allowed to proceed to a jury is without merit. Although whether a defendant has acted in bad faith is, once presented at trial, a question of fact to be decided by a jury, see *Commonwealth* v. *Pike*, 430 Mass. 317, 321 (1999), before reaching that stage, in order to prevail on a motion to dismiss, a plaintiff's complaint must indicate some facts that would allow a jury to find that the defendant acted in bad faith, *Nader* v. *Citron*, 372 Mass. 96, 98 (1977). This Chokel has not done.

761 (1974), when he denied Chokel an opportunity to amend his complaint. Chokel does not claim that he was denied an opportunity to amend as of right. Instead, he cites three occasions on which he requested leave to amend his complaint, and contends that each denial was an abuse of the judge's discretion under rule 15 (a), which instructs that "leave [to amend] shall be freely given."

Chokel claims that his first request for leave to amend his complaint was made on September 12, 2003, not by separate motion, but in his memorandum opposing the directors' motion to dismiss. The opposition memorandum to which he refers, however, does not appear in the record appendix. It is Chokel's obligation to include in the record appendix any documents on which he relies, including any memoranda of law. See *Aronson* v. *Commonwealth*, 401 Mass. 244 (1987), cert. denied, 488 U.S. 818 (1988); *Shawmut Community Bank, N.A.* v. *Zagami*, 30 Mass. App. Ct. 371, 373 (1991), *S.C.*, 411 Mass. 807 (1992). When a party fails to include a document in the record appendix, an appellate court is not required to look beyond that appendix to consider the missing document. *S. Kemble Fischer Realty Trust* v. *Board of Appeals of Concord*, 9 Mass. App. Ct. 477, 478-479 n.2, cert. denied sub nom. *Costello* v. *Board of Appeals of Concord*, 449 U.S. 1011 (1980). Because Chokel's first request for leave to amend his complaint does not appear in the record appendix, we do not consider whether the judge abused his discretion in denying leave to amend.

The second request to amend was made on November 26, 2003, after judgment dismissing the action had entered for Genzyme, and was contained in a motion to alter or amend a judgment under Mass. R. Civ. P. 59 (e), 365 Mass. 827 (1974). The third request was on December 31, 2003, accompanied by a motion for relief from judgment under Mass R. Civ. P. 60 (b), 365 Mass. 828 (1974). Once a claim has been dismissed, a court must first set aside judgment under rule 59 (e) or 60 (b) before allowing a claim to be amended. See, e.g., *Bengar* v. *Clark Equip. Co.*, 24 Mass. App. Ct. 41, 44 (1987), *S.C.*, 401 Mass. 554 (1988); *Ahmed* v. *Dragovich*, 297 F.3d 201, 208 (3d Cir. 2002); *Acevedo-Villalobos* v. *Hernandez*, 22 F.3d 384, 389 (1st Cir.), cert. denied, 513 U.S. 1015 (1994); 6 C.A. Wright,

Chokel *v.* Genzyme Corporation.

A.R. Miller & M.K. Kane, Federal Practice and Procedure § 1489, at 692-693 (2d ed. 1990). In this case, both the November 26 and December 31 motions argued only that judgment should be set aside because the first request for leave to amend was improperly denied. As we have explained, because the first request to amend does not appear in the record appendix, we do not review the propriety of its denial. We will not review motions filed after judgment has entered seeking to set aside a judgment based on the allegedly improper denial of a motion that is not before us. Therefore, the judge's decision denying relief under rule 59 (e) or 60 (b) remains undisturbed, and Chokel's argument that he should be allowed to amend his complaint fails.

*Judgment affirmed.*