Sanders, Janet L., J.
This case arises from competing interpretations of agreements executed in connection with the rehabilitation of an affordable housing complex in Cambridge. Plaintiff Homeowner’s Rehab Inc. (HRI) was the nonprofit sponsor of the development. Plaintiff Memorial Drive Housing, Inc. (Memorial Drive) is the General Partner under a Limited Partnership Agreement entered into among the par *15 ties. Plaintiffs instituted this action against the Limited Partners, contending that the defendants’ interpretation of that agreement together with a related Option Agreement effectively prevents HRI from exercising a right of first refusal conferred upon it when the partnership was formed. The defendants have asserted counterclaims alleging among other things that, in an effort to trigger that right of first refusal in favor of HRI, plaintiffs breached their fiduciary duties to defendants.
In July 2015 this Court (Roach, J.) denied plaintiffs’ Motion for Judgment on the Pleadings (the July 2015 Decision). Although the Court noted that the plaintiffs appeared to be on strong ground in their interpretation of the relevant documents and that “much of what will ultimately be required to construe the Agreement is already available,” Judge Roach agreed with the defendants that there were factual issues remaining as to whether plaintiffs had put their own interests first in the manner by which they had gone about invoking their rights and obtaining an offer on the Property, particularly since she was bound at that stage in the proceedings to take as true all the factual allegations contained in defendants’ counterclaims. Judge Roach also pointed out that Memorial Drive apparently had not given defendants access to the partnership’s books and records, which might be relevant to the issues before the Court. Discovery was conducted, and the plaintiffs, essentially renewing the arguments they made before Judge Roach but on a more complete factual record, now move for summary judgment in their favor. This Court concludes that the plaintiffs’ Motion must be Allowed.
BACKGROUND
The summary judgment record contains the following undisputed facts. In July 1997, the parties entered into an extensively negotiated and documented deal for the redevelopment, rehabilitation and financing of land and buildings located at 808-812 Memorial Drive in Cambridge as affordable housing (the Property). In furtherance of that project, the parties established a Limited Partnership, with their rights and obligations set forth in a Limited Partnership Agreement. Memorial Drive is the General Partner of the partnership. Defendant Centerline Corporate Partners V L.P. (Cen-terline) is the Limited Partner, and the defendant Related Corporate V SLP L.P. (Related) is the Special Limited Partner or SLP. HRI was the nonprofit sponsor of the redevelopment of the Property and a majority owner of Memorial Drive. The partnership acquired a 99-year lease for the Properly. The Properly is owned by a charitable trust created by HRI, with HRI designated as the trust’s sole beneficiary.
The Properly consists of 211 affordable apartment units, 89 market rate units, commercial space and a 262-space parking garage. As a “qualified low-income housing project,” it was eligible for financing under the Low Income Housing Tax Credit (LIHTC) provision of the Internal Revenue Code., 26 U.S.C. §42 (Section 42). LIHTC projects generate tax credits for equity investors over a ten-year period and are subject to a 15-year “compliance” period in which they must be maintained as affordable housing if investors are to avoid recapture of the tax benefits. The compliance period for the Property here ended December 31,2012.
Pursuant to the Partnership Agreement, the defendants as Limited Partners acquired a 99.98 percent interest in the partnership and made capital contributions of $6.9 million — an amount directly tied to the amount of tax credits that the Limited Partners anticipated receiving. As General Partner, Memorial Drive made a small capital contribution but was to have “full and complete charge of the management of the business of the partnership in accordance with its purpose,” Section 5.1A. That purpose is defined in Section 2.5A of the Partnership Agreement as “investment in real properly and the provision of low income housing through the construction, renovation, rehabilitation, operation and leasing” of the Properly.
As part of the deal and in accordance with Section 42, the Partnership executed a Right of First Refusal and Option Agreement (the Option Agreement). The Option Agreement was between the Limited Partnership and HRI (described as the “Holder”). The Option Agreement provided HRI with two potential mechanisms by which it could acquire the Partnership’s interest in the Property. The first mechanism was set forth in Section 2 and 3 and gave HRI a Right of First Refusal (ROFR), described as “absolute, exclusive, and continuing.” Section 2 described how and when this right could be exercised:
Notice of Disposition: At any time commencing on the date hereof and ending on the date which is four years after the last day of the 15-year compliance period with respect to the Property pursuant to Section 42 of the Code, the Partnership shall not directly or indirectly grant, sell, transfer, exchange, assign, give or otherwise dispose of its interest in the Properly without it first being offered in writing to the Holder in accordance with the terms and conditions of this Agreement and until at least ninety (90) days after the Partnership shall have delivered to the Holder notice of an offer to purchase the Property from such purchaser (hereinafter the “Disposition Notice”). The Disposition Notice shall specify the portion of the Property proposed to be disposed, the names and addresses of each person or entity to whom the Partnership proposes to make such disposition, the consideration payable therefore (“the Third-Party Price”), and all other terms of the proposed disposition, together with a copy of any executed or proposed agreement(s) setting forth the terms of the proposed disposition and all other instruments related thereto, a statement indicating whether the Partnership is willing to accept the offer and the Partnership’s estimate of the Restricted Market Price as hereinafter defined.
As to the price that HRI would pay if it were to exercise its ROFR, that was described in Section 3 of *16 the Option Agreement: HRI could acquire the Partnership’s interest for the lesser of three prices: a) the “Section 42 Price” (a term defined by 26 U.S.C. 42 ((i) (7)); b) the “Third-Party Price as specified in the Disposition Notice”; or c) the “Restricted Market Price.” The Restricted Market Price is fair market value, subject to certain restrictions encumbering the Property.
The second mechanism by which HRI could acquire the interest of the Partnership was set forth in Section 6 of the Option Agreement. That provision stated that HRI could, at the end of the 15-year compliance period, make its own offer to acquire the Property. As to what the purchase price would be, only one option was given: HRI had to pay the Restricted Market Price. Under this provision, the Partnership could dispute the price proposed by HRI and the matter would then be submitted to an appraiser.
The Partnership Agreement specifically references the Option Agreement (defined under the Partnership Agreement to include the RFOR), and gives some indication as to the parties’ intentions in executing it. For example, Section 5.4.C(iii) of the Partnership Agreement states: “The partnership and HRI agree that, with respect to the Option Agreement, it is their intention that the purchase price under the Option Agreement be the minimum price consistent with the requirements of Section 42(i)(7).” The Partnership Agreement makes another reference to the Options Agreement which is important to resolution of the issues before the Court: Section 5.4A states:
The General Partners . . . are hereby authorized to sell ... all or substantially all of the assets of Partnership; provided, however, that, except for a sale pursuant to the Option Agreement, the terms of any such sale must receive the consent of the Special Limited Partners before such transaction shall be binding on the partnership.
In other words, if the proposed sale was pursuant to the Option Agreement, the SLP’s consent was not required.
In connection with the negotiation of these agreements, HRI requested that the defendants provide it with financial projections as to the anticipated return on their investment. The defendants provided a memorandum from the firm of Reznick, Feder & Silverman dated May 21, 1997 (the Reznick Memo). See Exhibit S of Joint Appendix. The Reznick Memo was part of the closing documents. That memo projected that the Limited Partners would receive $6.9 million tax credits between 1997 and 2012 — an amount which coincided with their capital contribution. The Reznick Memo also projected what return the Limited Partners would receive in the event the Partnership interests were sold December 31, 2012 for $1 over the mortgage balance. Taking into account the tax benefits they would receive and even after payment of any exit taxes resulting from the sale, the Limited Partners could be expected to net $3.3 million over their capital contribution of $6.9 million. In other words (as described by the Memo), the benefit to the Limited Partners in providing equity for the project was not in a later sale but in the tax credits and benefit of tax losses that they would receive. They did in fact reap such benefits: from 1997 when these agreements were executed up to the end of the compliance period in 2012, the Limited Partners received approximately $7.5 million in tax credits and took advantage of over $24 million in tax losses.
After the compliance period had run, Peter Daly contacted Centerline in October 2013 about HRI’s acquiring the Limited Partners’ interest in the Property. Daly is Executive Director of both HRI and of Memorial Drive, the General Partner. As to what HRI would pay, Daly proposed using the “Minimum Price Methodology” that was attached to the Partnership Agreement as Schedule C. The title to that document is: “Projection of General Partner Purchase Price upon Sale or Disposition of the Project on 12/31/2012" and is further described as the ’’Section 42 Price pursuant to the Right of First Refusal." As noted above, the “Section 42 Price” was one of the options for calculating purchase price if HRI was exercising its ROFR under Sections 2 and 3 of the Option Agreement; it was not an option under Section 6 where HRI made an offer independent of exercising its ROFR in the face of a third-party offer. As Daly explained in his affidavit, “HRI was attempting not to invoke the ROFR but rather to buy out the Limited Partners interest using the Minimum Methodology rather than going through the lengthy ROFR process of soliciting and responding to an offer.” It was his belief that the agreements entitled him to insist on the buyout price he had proposed. As he testified to at his deposition, “it was always our intention to acquire the property, in accordance with our agreement of debt plus a dollar, and that was what our offer was going to be.” See Daly deposition, p. 33 (Exhibit U of Joint Appendix).
Interpreting the language of the agreements differently, the defendants did not agree to the purchase price that Daly proposed and insisted that, if HRI was to acquire the Limited Partners’ interest, it had to do so directly, pursuant to Section 6 of the Option Agreement. The purchase price under that section was the Restricted Market Price. As to whether HRI could rely on Sections 2 and 3 of the Option Agreement, the defendants took the position that those sections applied only if the Partnership were willing to sell to a third party and that required the consent of the Special Limited Partner. Without their consent, they maintained that Memorial Drive as the General Partner was not in a position to solicit or even entertain offers from third parties, and without such a third party offer, the ROFR (with its Section 42 price option) was simply not triggered.
Multiple letters and emails were exchanged between January and June 2014 regarding the parties’ different interpretations of what the agreements required if HRI was to buy out the defendants. Among those communications was a letter from HRI’s counsel to Daly dated *17 June 4, 2014. Counsel advised Daly to solicit offers on the Property so as to trigger the ROFR if the defendants continued to resist a consensual acquisition of the partnership’s interest at the price Daly had proposed. This letter was forwarded to the defendants, but they continued to adhere to their interpretation that the ROFR could not be triggered as long as the Limited Partners were unwilling to consent to a third party sale.
The ROFR was due to expire on December 30,2016. With that date approaching, Daly decided to contact Jeanne Pinado of the Madison Park Development Corporation (Madison Park), another nonprofit organization that develops affordable housing properties in Boston. He asked Pinado to make an offer on the Property and provided her with the necessary financial information for doing that. On November 19, 2014, Madison Park submitted a written offer to purchase the partnership’s interest in the Property for $42,175,000. It made an initial deposit of $10,000.
Pinado’s deposition and certain email exchanges between her and Daly are part of the summary judgment record and reveal the following. Daly and Pinado knew each other through their common work in affordable housing for over two decades. Pinado agreed that Daly had reached out to her asking Madison Park to make an offer on the Properly as a “favor.” She also knew that any offer Madison Park did make was subj ect to an ROFR that HR! was likely to exercise. On November 19, 2014, Madison Park did make an offer — one that Pinado described as being a “good” one that was an “appropriate offer for the Property,” based on Madison Park’s own analysis of materials that Daly had supplied about the Property. It was a “preservation price ... a price that we would pay knowing that we wanted to preserve this property as affordable housing in perpetuity.” Pinado Deposition at page 49 (Exhibit T of Joint Appendix). Pinado testified that she believed that the offer was one that the partnership would accept if HRI did not exercise its ROFR and was one that Madison Park was prepared to honor and that it “had the resources to do.’’ Defendants have not offered any specific evidence to the contrary. Although Madison Park had not developed any affordable housing outside of Boston, Pinado testified that she would look to partner with an entity in Cambridge that was more familiar with the particular needs of that community in the event that the deal went through.
On November 20, 2014, Daly on behalf of Memorial Drive (the General Partner) issued what it regarded to be the Disposition Notice required by Section 2 of the Option Agreement. The Disposition Notice stated that: “The Partnership is willing to accept the offer [which the Notice enclosed] subject to consent of the Partnership’s limited partner.” It went on to state that the Partnership’s estimate of the Restricted Market Price was approximately $46,200,000. The Notice was sent to HRI and also to the defendants.
Centerline responded by letter dated November 26, 2014 entitled “Default Notice.” In this letter, Centerline once again reiterated its position that the General Partner had no authority to sell or accept any offer on behalf of the Partnership without the SLP’s consent. In support, it relied on the language of the relevant agreements.[1] Without such authority, it maintained that Memorial Drive could not issue the Disposition Notice. Moreover, in doing so, Memorial Drive had (according to Centerline) breached its fiduciary obligations under the Partnership Agreement.
On December 4, 2014, HRI issued a Purchase Notice informing the Partnership that it intended to exercise the ROFR. As explained in that notice, both the offer by Madison Park and the Section 42 Price were below the total amount of mortgage debt secured by the Property, which HRI would agree to assume. Thus, pursuant to the ROFR, HRI would not be required to pay any additional amounts to the defendants. It being clear that the defendants would not permit the sale, HRI together with Memorial Drive filed this lawsuit for declaratoiy relief.
DISCUSSION
Counts I, II and III of the Complaint seek declarations as to the parties’ respective rights and obligations in connection with the ROFR In their Counterclaim, the defendants allege breach of fiduciary duty, aiding and abetting such breach, and breach of the covenant of good faith and fair dealing. They also seek the removal of Memorial Drive as a General Partner and an injunction against the sale of the Property.[2] This Court concludes that plaintiffs are correct in their interpretation of the relevant documents. Because the Counterclaim is based on conduct that the relevant contracts clearly permit and because there is no additional evidence of bad faith on the plaintiffs’ part, this Court also concludes that the counterclaims must be dismissed. This Court turns to the contract issue first.
I. The Parties’ Contractual Rights and Obligations
The positions that the parties take regarding the meaning of the applicable agreements are essentially the same as the positions they took when Daly first approached the defendants about HRI’s acquiring the Partnership interests in the Property. Rebuffed in his offer that HRI buy out the Limited Partners for what was essentially the Section 42 Price, he took steps to trigger HRI’s Right of First Refusal by soliciting the third party offer from Madison Park. Defendants maintain (as they did then) that Memorial Drive had no authority to do that because the Limited Partners had not consented to any sale. Although such consent was not required if HRI was itself to make an offer to acquire the Property, that transaction was governed by Section 6 of the Option Agreement, which permitted the Limited Partners to demand a much higher sales price. In response, the plaintiffs rely on certain provisions of the Partnership Agreement that define the General Partner’s authority and ask that this Court interpret both that *18 agreement and the Option Agreement as a whole and against the backdrop of Section 42.
If this Court were to look only at the Option Agreement, this Court would have some difficulty determining which side has the better of the argument. Certainty, defendants’ position has some superficial appeal: if this Court were to construe the ROFR as the plaintiffs do, it is hard to see what purpose Section 6 serves — that is, what additional rights that it confers on HRI. On the other hand, to construe the ROFR as the defendants do would essentially render Section 3 meaningless. If the General Partner could not solicit or even entertain a third party offer without the Limited Partners’ consent, then the Limited Partners could simply withhold their consent — not an unreasonable position to take, since they know that they could get a higher price if HRI was forced to purchase their interest outright. If that consent were necessary to trigger the ROFR then it is hard to imagine a scenario in which HRI would be able to exercise the ROFR particularly since that right existed only between December 31, 2012 and December 31, 2016 when it expires.
The Option Agreement, however, cannot be read in isolation. It must be construed together with the Partnership Agreement and in line with the intent of the parties at the time that they executed these two contracts. Moreover, in order to understand the purpose of these documents, this Court does find it helpful to consider the context in which they were negotiated and the purpose of having a nonprofit entity like the plaintiffs join together with private investors looking for a return on their dollar. Specifically, these agreements were negotiated against the backdrop of the LIHTC program, created by Congress to promote the production and preservation of affordable rental housing. An understanding of that program thus informs this Court’s conclusions.
A. The LIHTC Program (26 U.S.C. §42)
The joint venture that these contractual documents set up is one that is encouraged by Section 42 of the Tax Code, which provides subsidies in the form of tax credits to developers of affordable housing. The partnership arrangement between the plaintiffs and the defendants is a fairly typical one.[3] The developer joins with equity investors who generate enough federal tax liability to enjoy the full value of those tax credits. Where the developer is a non-profit entity (as here) that is particularly necessary since the tax credits have no value to a tax-exempt organization. In order to obtain the benefit of these credits, the investors are required by the Tax Code to hold amajority of the equity in the project and thus make the larger capital contribution. To maximize the equity generated by the credits, the investors as limited partners typically take a 99 percent partnership interest. That is precisely what happened here.
The developer as General Partner (here Memorial Drive) has day-to-day managerial responsibility for developing and operating the real estate, ensuring compliance with use restrictions, and seeing to long term asset management. Although the General Partner may be compensated for its work through developer fees, the real incentive lies in its ability to acquire the projected back from the partnership at the end of the 15-year compliance period. By that time, Limited Partners will have reaped the full benefit of the tax credits after the 15-year period. A study by the Department of Housing and Urban Development notes that the great majority of qualified projects result in a transfer of the investors’ interest in the property to the General Partner or its subsidiary at the end of this 15-year period. See footnote 3, supra. Where the developer is a nonprofit, the expectation is that the properly will continue to be operated as affordable housing — an added public benefit of such a transfer. That is not necessarily the case if the limited partner/investors continue as owners, however.
Section 42 explicitly envisions that qualified nonprofit developers or sponsors like HRI may be granted a right of first refusal to acquire the project back from the partnership for a minimal purchase price at the end of the compliance period. In non-profit sponsored deals, the price often attached to the exercise of that right is the so-called Section 42 Price, where the investors realize little cash (having already enjoyed the benefit of the tax credits) but are relieved of the outstanding debt, which the developer assumes. If the General Partner is required to finance a sales price exceeding that debt, that will in turn limit the cash flow that is available for operating the properly and meeting its capital needs over time. A transfer of the ROFR at the Section 42 price thus contributes to the overall goal of promoting the continuing availability of affordable housing.
This Court’s job, of course, is to interpret the documents before me, not necessarily to promote any particular policy agenda. That is, the Tax Code permits an ROFR precisely like the one at issue here but the terms upon which HRI may exercise it depends on the agreements that were actually negotiated. Still, the Partnership Agreement itself expressly recognized that one of the primary purposes of the Partnership is to provide affordable housing so that purpose is relevant in interpreting its provisions. The powers and responsibilities that the Partnership Agreement confers on the General Partner are also important to this Court’s interpretation of the Option Agreement. This Court thus turns to the wording of those documents, construing them together as a whole and in line with what the parties intended at the time they were drafted.
B. The Agreements
Under Section 2 of the Option Agreement, the ROFR is triggered when the “Partnership” delivers a notice to the Holder (HR) that there is an offer to purchase the Property. This Disposition Notice shall specify, among other things, the terms of “any executed or proposed agreement” from a third party to buy the Property, and “a statement indicating whether the Partnership is willing to accept the offer.” (Emphasis added.) In other words, the offer need not be accepted by the Partnership *19 nor need it be ready and willing to do so in order to trigger the ROFR The Disposition Notice regarding Madison Park’s offer stated that it was “subject to consent of the Partnership’s limited partner.” The question before the Court is whether Memorial Drive could solicit or otherwise entertain this offer and issue the Disposition Notice without first getting the Limited Partners’ consent to do so. Based on this Court’s reading of the Partnership Agreement, this Court concludes that it could.
As described by the Partnership Agreement, the powers of the General Partner are quite broad. As General Partner, Memorial Drive was given “full and exclusive and complete charge of the management of the business of the Partnership in accordance with its purpose,” that purpose being the provision of low income housing. Section 5.1A. It is “authorized to take all action necessary to carry out the purposes of the Partnership.” Section 5.2A(i). It has the sole right to act on behalf of the Partnership and is authorized, “without the requirement of any act or signature of the other Partners ... to execute any and all instruments, agreements, contracts, certificates, or documents requisite to carrying out the intention and purpose of this Agreement . . .” Section 5.3A(v). As to the power to sell or dispose of the Properly, that is dealt with in Section 5.4A, which says that the General Partner may “sell lease, exchange, refinance, or otherwise transfer, convey or encumber all or substantially all of the assets of the Partnership so long as it has the ’’consent of the Special Limited Partner before such transaction shall be binding on the Partnership." See also 5.5B(iv). There is one important exception to that restriction, however: if the sale is “pursuant to the Option Agreement,” then the SLP’s consent is not required. Thus, the SLP cannot hold up a transaction where HRI is acquiring the Property directly pursuant to Section 6 of the Option Agreement. This Court concludes that this section also means that the SLP cannot hold up a transaction whereby HRI is exercising its ROFR under Section 3. To construe Section 2 and 3 to require the Limited Partners’ consent before a Disposition Notice can issue would mean that the Limited Partners could hold up a sale to HRI — a possibility clearly prohibited by the Partnership Agreement. Defendants argue that, since a sale to a third party cannot be consummated without the SLP’s consent (a proposition that plaintiffs concede), it necessarily follows that the General Partner cannot solicit or accept a third party offer without such consent as well. To conclude otherwise would “eviscerate the General Partner’s fiduciary duty by forcing the sale of the Property to HRI against the express wishes and the financial best interests of the Limited Partners.” See Memorandum in Opposition to Motion, p. 5. This Court fails to find anything in the Partnership Agreement, however, which would prevent Memorial Drive from doing exactly what it did here.[4] Indeed, as already explained above, the General Partner’s powers are quite broad. As to the financial interest of the Limited Partners and the expectations they had when they entered into these agreements, the Partnership Agreement itself, together with the Closing Documents that were part of that deal, do not support defendants’ position that they will somehow be deprived of their bargained for benefits.
Section 5.4C(iii) speaks directly to what the parties anticipated would occur: ‘The Partnership and HRI agree that, with respect to the Option Agreement, it is their intention that the purchase price under the Option Agreement be the minimum price consistent with the requirements of Section 42(i)(7).” The parties’ agreed upon methodology for calculating the Section 42 Price was attached to the Partnership Agreement as Schedule C. There is no real dispute (at least for purposes of this Motion) that application of this methodology would require HRÍ to pay $0 or $1 in cash to the Limited Partners to acquire their interest in the Properly. As to the projected benefits that the Limited Partners would receive, those were outlined in the projections made in the Reznick Memo. Taking into account the tax benefits together with the anticipated tax losses that they would receive over the 15-year compliance period together with the exit taxes they would have to pay in the event of a sale, the Limited Partners would still stand to realize a net profit of $3.3 million over and above their original investment — a 17.519 percent of return on their initial investment. Thus to interpret the ROFR as the plaintiffs do would not deprive the defendants of the benefit of their bargain.
In considering these projections, this Court does not run afoul of the parol evidence rule, as defendants contend. The Reznick Memo was part of the Closing Documents. Moreover, those projections, and certain statements made in Daly’s affidavit regarding why they were important, are not offered by the plaintiffs to alter or contradict the terms of either agreement; rather, they are offered to support their interpretation of the terms and their position that such interpretation is in line with the expectations of the parties at the time the documents were executed. Significantly, the defendants offer no evidence disputing these projections. Moreover, the terms of Partnership Agreement make it clear maximizing the tax benefits for the Limited Partners was a key component of the arrangement. Indeed, the Partnership Agreement contains no language to support the claim that the Limited Partners expected to receive the residual value of the Property on a sale.
II. The Counterclaims
The defendants claim that, even if this Court were to conclude that Memorial Drive’s actions were not strictly prohibited by the agreements, the General Partner’s “complicfiy” in offering the Properly for sale to Madison Park breached its fiduciary duty to the defendants, breached the covenant of good faith and fair dealing, and that HRI aided and abetted in that wrongdoing. At the very least, they argue that there are disputes of material fact as to these claims. This Court disagrees.
*20 This Court recognizes that a general partner owes a fiduciary duty to the limited partners in a limited partnership and that this duly requires adherence to the “highest standards of good faith and fair dealing” in the performance of contractual obligations. Krapf v. Krapf, 439 Mass. 97, 103 (2003); see also Donahue v. Rodd Electrotype Co., 367 Mass. 578, 593 (1971). Itis also true, however, that the contours of that fiduciary duty are subject to contract. Fronk v. Fowler, 456 Mass. 317, 331 (2010). Where the contested action falls entirely within the scope of a contract between the parties, and the defendant has acted in good faith in compliance with that contract, its conduct cannot give rise to a claim for breach of fiduciary duly. Chokel v. Genzyme Corp., 449 Mass. 272, 278 (2007); see also Blank v. Chelmsford Ob/Gyn, P.C. 420 Mass. 404, 408-09 (1995). As to the claim for breach of the covenant of good faith and fair dealing, “the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.” Uno Restaurants v. Boston Kenmore Realty Corp., 441 Mass. 376, 386 (2004). It requires that “neither party ... do anything that will have the effect of destroying or injuring the right of other party to receive the fruits of the contract.” Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass.451, 471-72 (1991). The covenant may not, however, “be invoked to create rights and duties not otherwise provided in the contractual relationship.” 441 Mass. at 386.
Applying these principles to the instant case, this Court concludes that the complained of conduct falls squarely within the scope of the applicable agreements. Because this Court has concluded that the plaintiffs were contractually authorized to engage in the conduct that is the subject of these counterclaims, it necessarily follows that they cannot be held liable under these alternative tort based-theories.
In support of these counterclaims, the defendants characterize the solicitation and receipt of the offer from Madison Park as a “sham” and part of a “secret scheme” concocted to trigger the ROFR. The assertion that this was somehow secret, however, is not supported by the summary judgment record. When the defendants insisted that HRI could acquire the Property only pursuant to Section 6 of the Option Agreement, Daly all but announced the fact that he would be soliciting third party offers when he enclosed in a June 2014 email to the defendants a letter from his counsel instructing him to consider doing exactly that. See fii.4, supra. He did so only after months of communications between the parties made it clear that they fundamentally differed in what the applicable agreements permitted the General Partner to do. As to the fact that Madison Park’s offer was solicited, there is nothing in the agreements to prohibit such solicitation, which would seem in any event to be the only way of testing whether HRI intended to invoke its ROFR: anyone familiar with LIHTC projects would have to know of such rights and would be unlikely to make an offer if it were not solicited. That Pinado knew that HRI was likely to exercise the ROFR does not make Madison Park’s offer any less enforceable or somehow mean that it cannot qualify as the type of offer sufficient to trigger the ROFR.
Finally, the ROFR is not a typical right of first refusal but rather a statutorily defined one designed to allow non-profit entities to buy back property at the end of the 15-year compliance period at a preset price which (depending on market conditions) is substantially below fair market value. While a third-pariy offer may be necessary to trigger it, the amount of that offer will not have any impact on what the nonprofit has to pay unless that offer is less than the Section 42 Price. Thus, that Madison Park’s offer was $4 million less than the Restricted Market Price is essentially irrelevant. What is necessary is that the third party offer be enforceable and Madison Park’s offer qualified as such: it was in writing, contained all essential terms, and was accompanied by a $10,000 deposit. Defendants present no evidence to contradict Pinado’s testimony that she had the resources and the intent to go through with it in the event HRI did not exercise its ROFR That is enough.
CONCLUSION AND ORDER
The Plaintiffs’ Motion for Summary Judgment on their own claims and on the Counterclaims of the Defendants is ALLOWED in its entirety. The parties will confer as to a proposed form of judgment. In the event that there is disagreement, the different proposals will be served with this Court in compliance with Rule 9A and any disputes will be resolved at a hearing on October 15, 2016 (formerly the date for a Final Pretrial Conference). The Trial Date of November 29, 2016 is cancelled.

 At some point, Centerline had been bought out by another entity. This change of ownership is relevant for purposes of this case only in that the investors who actually entered into the Partnership and Option Agreements in 1997 were no longer in the picture in 2014. There is thus no one on the defendants’ side who can offer any evidence as to the intent of the parties, at the time the agreements were executed, regarding the meaning of contract terms beyond what the contracts themselves say.

 Although plaintiffs had set a closing date for the sale to HRI, they agreed not to proceed with that sale until the Court issued its July 2015 decision. The plaintiffs have made no effort to proceed with the sale since then.

 To understand the LIHTC program that set up these tax credits, this Court found particularly helpful two publications cited by plaintiffs. One was authored by a policy division of the Department of Housing and Urban Development. Khadduri, Jill et al. What happens to Low Income Housing Tax Credit Properties at Year 15 and Beyond? U.S. Department of Housing and Urban Development/Office of Policy Development and Research (Washington D.C. August 2012). The second source was: Mittereder, Eric, Pushing the Limits of Non-Profit Guarantees in LIHTC Joint Ventures, Journal of Affordable Housing, vol. 22, No. 1, pp. 80 et seq.

 Daly did not pursue the course of action that he did without obtaining legal advice from his own counsel — advice he shared with the defendants before he reached out to Madison Park. This advice is not binding on this Court, but it does have some bearing on the question of whether Daly proceeded in good faith.