APPEALS COURT 
 
 HASSELTINE HOUSE, LLC, & another[1] vs. JEWISH FAMILY AND CHILDREN'S SERVICES, INC.

 
 Docket:
 24-P-171
 
 
 Dates:
 November 13, 2024 – September 10, 2025
 
 
 Present:
 Rubin, Shin, & Hodgens, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Landlord and Tenant, Termination of lease. Contract, Lease of real estate, Termination, Implied covenant of good faith and fair dealing. Notice. Practice, Civil, Summary judgment.
 
 

       Civil action commenced in the Superior
Court Department on December 17, 2018. 
      The case was heard by Shannon Frison, J.,
on motions for summary judgment. 
      Leonard M. Davidson for the plaintiff.
      Lawrence G. Green (Dean A. Elwell also
present) for the defendant.
      HODGENS, J.  The plaintiff, Hasseltine House, LLC
(landlord), entered into a lease and a separate service agreement with the
defendant, Jewish Family and Children's Services, Inc. (tenant), in connection
with a residential facility.  Both the
lease and the service agreement contained a provision outlining special
termination rights for the tenant.  Weeks
later, the landlord, the tenant, and Brookline Bank entered into a subrogation
and non-disturbance agreement (SNDA) in connection with the facility.  After almost five years of operations, the
tenant invoked its special termination rights. 
Alleging in part that the tenant lacked any special termination rights
without first obtaining approval from Brookline Bank under the SNDA, the
landlord filed a complaint in the Superior Court claiming breach of two
contracts, the lease and the service agreement, and seeking declaratory relief.  On cross motions for summary judgment, a
judge denied so much of the plaintiffs' motion as pertained to the landlord's
claims and allowed the tenant's motion. 
The landlord appeals, and we affirm.
      Background.  On August 30, 2013, the parties executed a
sixteen-year lease for property located in Newton at an annual rate of $392,280
(with monthly installments of $32,690). 
On the same date, in connection with the premises, the parties executed
a service agreement that outlined the responsibilities of the parties regarding
the operation of a residential facility designed for fourteen persons with
intellectual and developmental disabilities. 
The lease incorporated the service agreement by reference, and both the
lease and the service agreement provided that the terms of the lease would
control in the event of any conflict. 
Both the lease and the service agreement contained nearly identical
special termination rights that allowed the tenant to terminate the lease when
five residents indicated an intent to vacate the facility.  Under the service agreement, the tenant
agreed to conduct outreach and marketing to attract residents and to fill
vacancies expeditiously through its best efforts, and the landlord agreed to
work cooperatively with the tenant to market the facility and to maintain a
list of persons interested in residing there. 
The service agreement also required the tenant to notify the landlord
"promptly" if a resident provided notice of an intent to vacate the
facility.
      Weeks later, on September 10, 2013, the
tenant, the landlord, and Brookline Bank executed an SNDA in anticipation of
the landlord borrowing from the bank $2,625,000, secured by a mortgage,
security agreement, and assignment of leases on the Newton facility.  Under the SNDA, the tenant agreed to
subordinate its lease to the mortgage, and Brookline Bank agreed not to disturb
the tenant's rights under the lease.  The
SNDA also prohibited the tenant from cancelling or terminating the lease
without Brookline Bank's "prior written consent," which could not be
"unreasonably withheld, conditioned or delayed."  The SNDA did not reference the special
termination provision in either the lease or the service agreement, and neither
the lease nor the service agreement made any specific reference to the SNDA.
      After operating the Newton facility for
almost four years, in 2017 the tenant received a series of five "Resident
Notices of Termination," dated May 30, July 3, July 7, July 30, and August
2.  Through these letters, the residents
provided formal notice of an intent to vacate the facility in one year.  In August 2017, the tenant sent a letter to
the landlord with an update on the situation and cautioned, "Combined with
the four current vacancies, these five additional terminations, if none of
these vacancies are filled, will lead to an occupancy of only 5 of 14 units by
August 1, 2018."  The tenant noted
that the vacancies were "not an acceptable situation," and
"other options" would have to be explored if the vacancies could not
be filled.
      On January 24, 2018, the tenant sent the
landlord a letter (with a copy sent to Brookline Bank) regarding its intent to
terminate the lease and the service agreement one year later.  The letter referenced "five or more
Resident Notices of Termination" and invoked the "special termination
rights" in the lease and the service agreement that the tenant alleged
authorized it to terminate these agreements in light of the anticipated
vacancies:  "In accordance with the
terms of the Lease and Service Agreement, the Lease and Service Agreement will
then terminate on the later of January 31, 2019 or the date of the successful
relocation of all residents."
      Almost one year later, on December 17,
2018, the landlord filed its complaint in the Superior Court seeking damages
for, among other things, breach of contract (under the lease and the service
agreement) and seeking declaratory relief. 
The complaint alleged that the tenant lacked any right to terminate the
lease because it failed to obtain written approval from Brookline Bank under
the SNDA.  As the landlord puts it here,
the lease and the service agreement were governed by their terms and "also
governed by" the SNDA executed by the landlord, the tenant, and the Bank.  The complaint further alleged that the tenant
failed to market the facility to appropriate clientele, to conduct outreach and
attract residents, and to use its best efforts to fill vacancies.  On appeal, the landlord contends that its
motion for summary judgment should have been allowed, and the tenant's motion
for summary judgment should have been denied.
      Discussion.  "We review a decision on a motion for
summary judgment de novo." 
Conservation Comm'n of Norton v. Pesa, 488 Mass. 325, 330 (2021).  Interpretation of contracts and leases
presents a "question of law for the court" (citation omitted).  Cambridge St. Realty, LLC v. Stewart, 481
Mass. 121, 130 (2018).  Summary judgment
is proper where the record "show[s] that there is no genuine issue as to
any material fact and that the moving party is entitled to a judgment as a
matter of law."  Mass. R.
Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002).  "When both parties have moved for
summary judgment, as they did here, we view the evidence in the light most
favorable to the party against whom judgment was entered."  Wortis v. Trustees of Tufts College, 493
Mass. 648, 662 (2024).
      1. 
Special termination rights.  The
lease and the service agreement contain a special termination provision that is
not included in the SNDA.  Both the lease
and the service agreement allow the tenant to terminate the lease and the
service agreement if five residents have provided (and have not rescinded) a
formal notice of an intent to vacate the facility.  The SNDA does not contain any reference to
special termination rights.  Instead, the
SNDA contains a provision that prohibited the tenant from terminating the lease
"without [Brookline Bank's] prior written consent in each instance, which
consent shall not be unreasonably withheld, conditioned, or delayed."  On review of the three agreements at issue,
we conclude that the absence of written consent from Brookline Bank did not
preclude the tenant from exercising its rights under the lease and the service
agreement.
      We first examine the lease and the service
agreement to ascertain the intent of the landlord and the tenant.  As indicated by the plain language of the
lease and the service agreement (executed on the same day), the landlord and
the tenant expressly agreed that the tenant would have special termination
rights and thereby fixed an essential term of the tenancy.  See Finn v. Peters, 340 Mass. 622, 625 (1960)
(terms of tenancy are "fixed at its inception").  In the event of five vacancy notices out of fourteen
residential units, the special termination rights limited the tenant's risk on
its long-term lease, as well as the service agreement, by creating a hedge
against declining residential rental income. 
While it contemplated a future SNDA, the lease carefully safeguarded the
tenant's rights under the lease:  
"If any
holder of a mortgage . . . subsequent to the date of this Lease
. . . shall so elect, the interest of Tenant hereunder shall be
subordinate to the rights of such holder, provided that such holder shall agree
to recognize in writing the rights of Tenant under this Lease upon the terms
and conditions set forth herein. . ."  
Thus, the
tenant's special termination rights logically presented as "a major
inducement" for executing the lease and the service agreement and
"should be taken as controlling." 
Chelsea Indus. v. Florence, 358 Mass. 50, 55 (1970).
      There is nothing in the SNDA to suggest
that weeks after signing the lease and the service agreement the tenant
suddenly changed course and agreed to surrender its sole discretion to invoke
its special termination rights.  Indeed,
to hold as the landlord argues that the SNDA abruptly dispensed with the
tenant's special termination rights would "render illusory" the
substantial rights secured by the tenant just weeks earlier under the lease and
the service agreement.  Chelsea Indus.,
358 Mass. at 55-56 (employment contract provision protecting employee
controlled transaction though stock purchase agreement lacked provision).  Cf. Skilton v. R.H. Long Cadillac La Salle
Co., 265 Mass. 595, 596-597 (1929) (sales contract provision including
automobile trade-in controlled transaction though lease and promissory note
lacked provision); Chase Commercial Corp. v. Owen, 32 Mass. App. Ct. 248, 251
(1992) (loan agreement and security agreement provisions waiving jury trial
controlled transaction though guaranty agreement lacked provision).
      As these cases illustrate, since we are
construing the lease and the service agreement to see if they were breached, we
cannot read the SNDA in isolation.  We
must also look to the lease and the service agreement to discern what was
intended by the language in the SNDA. 
See Phoenix Spring Beverage Co. v. Harvard Brewing Co., 312 Mass. 501,
505 (1942) (as general rule multiple writings evidencing single contract must
be "read together").  See also
Restatement (Second) of Contracts § 202(2) (1981) ("all writings that
are part of the same transaction are interpreted together").  Because the lease conditioned the validity of
a future SNDA on the lender's recognition of the tenant's rights under the
lease, and Brookline Bank ultimately recognized those rights under the SNDA, we
conclude that all the documents, read together, expressed an intent to preserve
the tenant's special termination rights as set forth in the lease.
      The two cases cited by the landlord are
distinguishable from the multi-agreement analysis required here as those cases
involved discerning the intent of the parties from a single agreement.  See Healthco, Inc. v. E & S
Realty Assocs., 400 Mass. 700, 702 (1987) ("Healthco expressly agreed to
request E & S's consent before it assigned the lease to a third
party"); Tage II Corp. v. Ducas (U.S.) Realty Corp., 17 Mass. App. Ct.
664, 665 (1984) (lease "prohibited an assignment or subletting 'without
the Lessor's prior written consent'"). 
Unlike the situations presented in these single-agreement cases, the
present case requires us to examine the lease, the service agreement, and the
SNDA.  Where, as here, "the three
documents were in essence part of one transaction, they must be read together
to effectuate the intention" of the landlord and the tenant.  Chase, 32 Mass. App. Ct. at 250.
      Even if it breached a promise owed to
Brookline Bank under the SNDA, the tenant could still exercise its special
termination rights against the landlord under the lease and the service
agreement.  See Restatement (Second) of
Contracts § 297(1) (1981) (where party makes promises to two or more
parties "the manifested intention of the parties determines whether he
promises the same performance to all, a separate performance to each, or some
combination").  We reach this
conclusion because the tenant's obligation to seek approval of Brookline Bank
constituted one of the mutual promises between the tenant and Brookline Bank.  For example, the tenant agreed (1) to
subordinate the priority of the lease to the mortgage, (2) to pay rent to
Brookline Bank in the event of foreclosure, (3) to allow time for
Brookline Bank to cure any default under the lease, (4) to refrain from
making advance rent payments to Brookline Bank, and (5) to seek Brookline
Bank's approval before cancelling the lease. 
Brookline Bank agreed (1) to recognize the tenant's rights under
the lease, (2) to refrain from disturbing the tenant's right of occupancy,
and (3) to recognize the tenancy in the event of foreclosure.  We do not read any of these mutual promises
between the tenant and Brookline Bank to create any tenant obligations to the
landlord.  Our conclusion is further
buttressed by language in the SNDA that repeatedly expressed an intent to
preserve the tenant's rights under the lease and avoided any attempt to rewrite
the relationship of the landlord and the tenant.  Indeed, in its introductory provisions, the
SNDA acknowledged the overall intent to preserve that relationship as
delineated in the lease:  "The
Tenant requires as a condition to the Lease being subordinate to the Mortgage
that its rights under the Lease be recognized."  As a further indication that the lease
retained its force as the dominant agreement, the tenant promised in the SNDA
to deliver any necessary documents in the event of a foreclosure sale, but such
documents "shall not vary the terms of the Lease nor obligate the Tenant
to any greater obligation than contained in the Lease."  Thus, there is no basis for the landlord's
conclusion that the SNDA altered or "governed" any obligation set out
in either the lease or the service agreement.
      Given the expressed intent in the SNDA to
preserve the tenant's rights established by the lease and the service agreement
and the absence of any shared intent by the parties to the SNDA to modify these
agreements, we conclude that the tenant's obligations to Brookline Bank under
the SNDA did not alter the relationship between the landlord and the
tenant.  See I & R
Mechanical, Inc. v. Hazelton Mfg. Co., 62 Mass. App. Ct. 452, 455 (2004)
(contract formation requires parties to "give their mutual assent by
having 'a meeting of the minds' on the same proposition on the same terms at
the same time").  Because the
landlord, the tenant, and Brookline Bank did not all intend to limit the
tenant's exercise of its special termination rights against the landlord, the
tenant's notice of termination without Brookline Bank's written consent did not
constitute a breach of the tenant's contracts with the landlord.
      2. 
Prompt notice of vacancies.  In
"late August 2017," the tenant notified the landlord of resident
notices of termination dated May 30, July 3, July 7, July 30, and August
2.  The landlord contends that the tenant
breached the service agreement and the covenant of good faith and fair dealing
by failing to notify the landlord "promptly" of these anticipated
vacancies, thereby creating a material issue of fact.  See Bernard J. Basch & Sons v. Travelers
Indem. Co., 392 Mass. 1002, 1002 (1984) ("that both parties moved for
summary judgment does not mean that no material factual issue
remained").  Because the landlord
had no reasonable expectation of proving these claims, we conclude that summary
judgment properly entered for the tenant.
      To successfully state a claim for breach
of contract, a party "must demonstrate that there was an agreement between
the parties; the agreement was supported by consideration; the plaintiff was
ready, willing, and able to perform his or her part of the contract; the defendant
committed a breach of the contract; and the plaintiff suffered harm as a
result."  Bulwer v. Mount Auburn
Hosp., 473 Mass. 672, 690 (2016).  A
plaintiff must show "that any harm flowed from the breach of the
contract."  Forlano v. Hughes, 393
Mass. 502, 508-509 (1984).  "In no
event is recovery permitted of damages not resulting from the breach of the
contract, that is, not the consequences of such breach."  Boylston Housing Corp. v. O'Toole, 321 Mass.
538, 562 (1947).  The landlord contends
that a factfinder needs to determine whether the tenant acted
"promptly" under the service agreement by gradually and quietly
accumulating the five resident notices needed to invoke the special termination
rights and thereby thwarting the landlord's ability to fill vacancies as they
occurred.
      Even if we inferred that the tenant
delayed revealing the resident notices (received from May 30 through August 2)
until early August when it held enough notices to invoke its special
termination rights, the landlord offered no evidence that it "suffered
harm as a result" of such delayed notification.  Bulwer, 473 Mass. at 690.  Rather than showing harm, the record
indicates that the landlord suffered no harm from the tenant's conduct because
vacancies continued unabated during the five months between the time the tenant
provided notice in August 2017 and the time the tenant exercised its special
termination rights in January 2018.  See
Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC, 495 Mass. 207, 223 (2025)
(plaintiff must show that defendant "'destroy[ed]' or 'injur[ed]' the
plaintiff[']s ability to receive a benefit under the contract"); Schwartz
v. Travelers Indem. Co., 50 Mass. App. Ct. 672, 682 (2001) (summary judgment
proper where plaintiff had "no reasonable expectation of proving that harm
occurred as a result of any breach of contract").  Beyond indulging in pure speculation, there
was no evidence that notice provided before August 2017 would have enabled the
landlord to fill any vacancies and forestall termination.  See Carroll v. Select Bd. of Norwell, 493
Mass. 178, 194 (2024) (summary judgment cannot be defeated by speculation).
      The landlord's contention that the tenant
violated the implied covenant of good faith and fair dealing suffers from a
similar infirmity.  "[E]very
contract is subject to an implied covenant of good faith and fair
dealing."  Anthony's Pier Four, Inc.
v. HBC Assocs., 411 Mass. 451, 473 (1991). 
The covenant protects "the reasonable expectations" of the
parties, Chokel v. Genzyme Corp., 449 Mass. 272, 276 (2007), and provides
"that neither party shall do anything which will have the effect of
destroying or injuring the right of the other party to receive the fruits of
the contract."  Weiler v. PortfolioScope,
Inc., 469 Mass. 75, 82 (2014).
      As previously discussed, there was no
evidence that any delay by the tenant in notifying the landlord of vacancies
did any harm.  As such, the record does
not show the tenant "destroy[ed] or injur[ed]" any right of the
landlord to receive fruits of the contract.  Weiler, 469 Mass. at 82.  Also, given the tenant's special termination
rights expressed in both the lease and the service agreement, we discern no
violation of the landlord's "reasonable expectations."  Chokel, 449 Mass. at 276.  By availing itself of the special termination
rights and thereby limiting its financial exposure, the tenant did not violate
the implied covenant of good faith and fair dealing.  See A.L. Prime Energy Consultant, Inc. v.
Massachusetts Bay Transp. Auth., 479 Mass. 419, 435 (2018) (buyer of fuel did
not violate covenant where exercise of contract's "termination for
convenience" clause caused no injury to seller); Buffalo-Water 1, LLC v.
Fidelity Real Estate Company, LLC, 481 Mass. 13, 28 (2018) (buyer of commercial
building did not violate covenant where exercise of contract's option to
purchase caused no injury to seller).
      While the parties could have established
more stringent and specific notice requirements or otherwise limited the
tenant's exercise of its special termination rights, they did not do so.  The landlord cannot now "insert these
conditions into [the] contract . . . through the side door of the
covenant of good faith and fair dealing." 
Buffalo-Water 1, LLC, 481 Mass. at 28. 
"[T]he implied covenant of good faith and fair dealing cannot
create rights and duties that are not already present in the contractual
relationship."  Eigerman v. Putnam
Invs., Inc., 450 Mass. 281, 289 (2007).
Judgment
affirmed.

footnotes

[1] Cedar House,
LLC, which did not participate in this appeal.